**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-2511

LUZ MARINA CANTILLANO CRUZ; J.X.M.C.,

Petitioners,

v.

JEFFERSON B. SESSIONS III, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: December 6, 2016                                    Decided: March 13, 2017

Amended: March 14, 2017

Before MOTZ, KEENAN, and THACKER, Circuit Judges.

Petition for review granted; remanded for further proceedings by published opinion. Judge Keenan wrote the opinion, in which Judge Motz and Judge Thacker joined.

**ARGUED**: James Edward Tysse, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Petitioners. Yanal Harbi Yousef, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF**: Michelle A. Reed, Dallas, Texas, Steven H. Schulman, Matthew W. Kinskey, AKIN GRUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Petitioners. Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jamie M. Dowd, Senior Litigation Counsel, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

BARBARA MILANO KEENAN, Circuit Judge:

Luz Marina Cantillano Cruz (Cantillano Cruz), a citizen of Honduras, petitions for review of a final order of removal entered by the Board of Immigration Appeals (BIA).[1] The BIA affirmed an immigration judge's (IJ) conclusion that Cantillano Cruz was not eligible for asylum, withholding of removal, or protection under the Convention Against Torture (CAT). Cantillano Cruz argued before the BIA and IJ that she feared persecution on account of her nuclear family ties to her husband Johnny Martinez (Martinez), whom she suspected had been murdered by his employer. The BIA and IJ rejected this argument and determined that any persecution suffered by Cantillano Cruz occurred because she had threatened to report the employer to the police, an act that did not qualify as a basis for her requested relief.

Upon our review, we conclude that Cantillano Cruz's familial relationship with Martinez necessarily was one central reason for the persecution and fear of future persecution established by Cantillano Cruz, thereby meeting the statutory "nexus requirement" for asylum provided in the Immigration and Nationality Act (INA) in 8 U.S.C. § 1158(b)(1)(B)(i). Accordingly, we grant Cruz's petition and remand her case to the BIA for further proceedings.

---

[1] Cantillano Cruz's minor son joins her petition for review. For ease of discussion, we refer to Cantillano Cruz as the petitioner in this opinion. Our conclusions, however, apply equally to her minor son's derivative claims for relief from removal. *See* 8 U.S.C. § 1158(b)(3)(A).

2

In July 2014, Cantillano Cruz and her minor son entered the United States without authorization and presented themselves to immigration officials to request asylum. Several days later, the Department of Homeland Security (DHS) served Cantillano Cruz with a notice to appear charging her as an alien present in the United States without admission, under the provisions of 8 U.S.C. § 1182(a)(6)(A)(i). Cantillano Cruz conceded removability but filed applications for asylum, withholding of removal, and protection under the CAT.

At a hearing before the IJ, Cantillano Cruz claimed past persecution and fear of future persecution based on her membership in a "particular social group," namely, the "nuclear family of Johnny Martinez." *See* 8 U.S.C. §§ 1158(b)(1)(A), 1231(b)(3)(A). She testified and presented other evidence in support of her claim. The evidence showed that in 2003, Cantillano Cruz and Martinez began living together, and that, although they were never married, were considered a married couple by members of their community. The couple had two children together.

Between 2001 and 2007, Martinez worked for the Honduran government as a border patrol agent. However, in 2007, he obtained new employment working as the personal bodyguard to Danny Avila, who claimed to be a fisherman. For about five years, Martinez accompanied Avila on extended "fishing trips."

Martinez eventually learned that Avila worked with organized crime groups in Honduras and Colombia that were engaged in the trafficking of drugs and firearms. In May 2012, Martinez told Cantillano Cruz that because of Avila's criminal conduct,

Martinez planned to quit his job and to return to his employment as a border patrol agent. One week later, in June 2012, Martinez accompanied Avila on another "fishing trip," but Martinez did not return.

Cantillano Cruz and Martinez's uncle, Calin Isaias Ramirez Meza (Isaias), later visited the local boat dock to search for Martinez. Cantillano Cruz found Martinez's clothes and motorcycle abandoned there. When Cantillano Cruz and Isaias questioned Avila about Martinez's whereabouts, Avila told them to stop asking questions. After Isaias stated that he and Cantillano Cruz would "put [in] a police report," Avila threatened that they would suffer the same fate as Martinez. Cantillano Cruz and Isaias visited the dock a few more times to ask about Martinez, and encountered Avila there more than one year after their first encounter. Avila told them not to come back, and further warned "that there were dangerous people around."

After Cantillano Cruz returned home from her final visit to the dock, Avila contacted her and instructed her to "go to a certain place" to retrieve money owed to Martinez. Based on Avila's earlier threats, Cantillano Cruz declined his offer.

During a telephone call initiated by Avila, Cantillano Cruz assured Avila that she had no intention of contacting the police regarding Avila or her husband's disappearance. Nevertheless, on different occasions in 2013 and 2014, Cantillano Cruz observed Avila and his associates loitering outside her home. During these incidents, they brandished and fired weapons, and threatened to kill Cantillano Cruz and her children. Also, Avila and his associates killed Cantillano Cruz's dogs.

4

In July 2014, two days after the last threatening encounter, Cantillano Cruz fled Honduras with her younger child. Because she could not afford to bring both children with her, she left her older child with Martinez's mother. After Cantillano Cruz left Honduras, Avila continued to inquire about her whereabouts. Cantillano Cruz testified that Avila focused his threats on her because he knew that Martinez probably had told her about Avila's criminal conduct.

Upon considering Cantillano Cruz's testimony and the other evidence, the IJ concluded that she was credible. The IJ also credited the testimony of Dr. Thomas Boerman, an expert on the subject of organized crime in Honduras. Among other things, Dr. Boerman testified that Avila likely targeted Cantillano Cruz because he suspected that Martinez had told her about Avila's criminal activities.

In addressing Cantillano Cruz's claim for asylum, the IJ concluded that Cantillano Cruz was a member of a cognizable particular social group, namely, the "nuclear family members of Johnny Martinez." Even though the two never married, the IJ concluded that they lived together as domestic partners and were considered a married couple. However, the IJ further found that Cantillano Cruz failed to show that she had experienced persecution and feared future persecution "on account of her membership in the nuclear family" of Martinez.

The IJ instead determined that the "main reason" Avila had threatened Cantillano Cruz was to deter her from contacting the police. The IJ stated that "although family ties likely motivated" her search for Martinez and her decision to confront Avila, "that concern for [Martinez's] well-being could exist outside their familial relationship." The

5

IJ further observed that the only other family member who had been threatened was Isaias, who also had confronted Avila at the dock, and that neither Martinez's mother nor Cantillano Cruz's older child had received such threats. Additionally, the IJ found that the evidence was insufficient to conclude that Avila threatened Cantillano Cruz because she had learned about his criminal activities from Martinez. The IJ accordingly denied Cantillano Cruz's application for asylum, as well as her application for withholding of removal.[2]

The IJ also rejected Cantillano Cruz's request for protection under the CAT. Even though the IJ assumed that Avila had killed Martinez and would find Cantillano Cruz upon her return to Honduras, the IJ concluded that Avila had threatened Cantillano Cruz only about two times per year, and that the "situation never escalated to violence." The IJ further determined that Avila had threatened to harm Cantillano Cruz only if she reported Avila to police, which she had not done and did not intend to do if she returned to Honduras. Thus, the IJ concluded that Cantillano Cruz failed to show that she likely would be tortured if she returned to Honduras.

Cantillano Cruz appealed the IJ's ruling to the BIA. The BIA dismissed her appeal, adopting and supplementing the IJ's conclusions. According to the BIA, Avila's

---

[2] To establish eligibility for withholding of removal, an applicant must demonstrate the required statutory nexus between the persecution she suffered and her membership in a particular social group, but she bears a higher burden than that required to show eligibility for asylum. *Tang v. Lynch*, 840 F.3d 176, 183 (4th Cir. 2016). Thus, an applicant who is ineligible for asylum necessarily is ineligible for withholding of removal. *Id.*; *Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004).

threats constituted "[h]arm meted out by a private actor for personal reasons or solely on general levels of crime and violence in Honduras," which were insufficient bases to demonstrate eligibility for asylum and withholding of removal. The BIA also affirmed the IJ's denial of Cantillano Cruz's request for protection under the CAT.

Cantillano Cruz petitioned this Court for review. We granted her unopposed motion for stay of removal proceedings pending our review.

## II.

Cantillano Cruz contends that the BIA and IJ erred in concluding that she was not persecuted because of her membership in the particular social group of the nuclear family of Johnny Martinez. Citing our decision in *Hernandez-Avalos v. Lynch*, 784 F.3d 944 (4th Cir. 2015), Cantillano Cruz submits that her familial relationship with Martinez was "intertwined" with her actions resulting in Avila's threats toward her. Cantillano Cruz also submits that the BIA and IJ erred in their factual findings, contending that the record conclusively demonstrates that her nuclear family ties to Martinez were "at least one central reason" she was targeted and threatened by Avila.

In response, the government argues that the BIA and IJ applied the correct legal standard in concluding that Cantillano Cruz failed to establish the required nexus between her membership in a particular social group and persecution by Avila. According to the government, the record does not show that Cantillano Cruz was "singled out" by Avila based on her familial ties to Martinez, and that any interested party, even those outside the nuclear family of Martinez, could have investigated Martinez's whereabouts and

7

threatened to contact the police. The government contends that, therefore, substantial evidence supports the BIA's and IJ's conclusion that Avila did not threaten Cantillano Cruz based on her family relationship with Martinez. We disagree with the government's arguments.

Under the INA, the Secretary of DHS or the United States Attorney General has the discretion to grant asylum to any alien who establishes eligibility for such relief. 8 U.S.C. § 1158(b). An applicant seeking asylum must show that she is unable or unwilling to return to her home country "because of persecution or a well-founded fear of persecution on account of" a protected ground, namely, "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

Membership in "a particular social group" is a protected ground if that group consists of people who "share a common, immutable characteristic." *Crespin-Valladares v. Holder*, 632 F.3d 117, 124 (4th Cir. 2011). Here, the BIA and IJ properly concluded, and the government does not dispute, that by virtue of her domestic partnership with Martinez, Cantillano Cruz was a member of a cognizable particular social group, namely, "the nuclear family of Johnny Martinez."[3] *See Hernandez-Avalos*, 784 F.3d at 949 ("[M]embership in a nuclear family qualifies as a protected ground for asylum purposes.").

---

[3] A "nuclear family" is "a family group consisting of a father, mother, and children." Webster's Third New International Dictionary 1547 (2002).

Persecution occurs "on account of" membership in an immediate family when that relationship is "'at least one central reason for' the feared persecution." *Crespin-Valladares*, 632 F.3d at 127 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). This statutory nexus requirement is not limited to situations in which the applicant's proposed group membership constitutes the sole or dominant motivation for her persecution. *Oliva v. Lynch*, 807 F.3d 53, 59 (4th Cir. 2015); *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164 (4th Cir. 2009). Instead, more than one central reason may, and often does, motivate a persecutor's actions. *See Hernandez-Avalos*, 784 F.3d at 950; *Cordova v. Holder*, 759 F.3d 332, 338-39 (4th Cir. 2014). However, when membership in the proposed group is merely "incidental, tangential, superficial, or subordinate to another reason" for the persecution, the statutory nexus requirement is not satisfied. *Quinteros-Mendoza*, 556 F.3d at 164. After all, not "every threat that references a family member is made on account of family ties." *Hernandez-Avalos*, 784 F.3d at 950 n.7.

When, as in the present case, the BIA "adopts the IJ's opinion and supplements it with its own reasoning," we consider both rulings.[4] *Hernandez-Avalos*, 784 F.3d at 948.

---

[4] The BIA here issued a non-precedential opinion by a single BIA member, which opinion is entitled only to *Skidmore* deference. *See Cordova*, 759 F.3d at 337 n.3. This level of deference allows us to "rely on the agency's opinions as a 'body of experience and informed judgment' to which we may 'properly resort for guidance.'" *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)) (citation omitted). However, the extent of our deference "depends upon 'the thoroughness evident in [the BIA's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Id.* (citation omitted). As explained below, we conclude that the BIA's analysis here is not persuasive.

9

We review de novo the question whether the BIA and the IJ applied the correct legal standard in assessing the applicant's proof of the statutory nexus requirement. *See Cordova*, 759 F.3d at 337. In contrast, the assessment of a persecutor's motivation presents a "classic factual question." *Crespin-Valladares*, 632 F.3d at 127-28; *see also Temu v. Holder*, 740 F.3d 887, 891-92 (4th Cir. 2014) (no rational factfinder could simultaneously credit facts showing that applicant was "singled out" for his mental illness yet conclude that there is no nexus between his mental illness and his mistreatment). Thus, our review of the BIA's and IJ's determination of this factual question is limited to considering whether their conclusion is "supported by reasonable, substantial, and probative evidence." *Ngarurih v. Ashcroft*, 371 F.3d 182, 188 (4th Cir. 2004).

We treat the IJ's factual findings as conclusive, unless a reasonable adjudicator would be compelled to reach a contrary conclusion. *Cordova*, 759 F.3d at 337. Accordingly, on a petition for review of a decision by the BIA and IJ holding that an applicant is ineligible for asylum, we may vacate the denial of asylum only if that decision is "manifestly contrary to law and an abuse of discretion." *See id.*; 8 U.S.C. § 1252(b)(4)(D).

Although this standard is stringent, we have been compelled to disagree with several of the BIA's recent decisions holding that an applicant failed to meet the statutory nexus requirement for obtaining relief from removal. *See Oliva*, 807 F.3d at 59; *Hernandez-Avalos*, 784 F.3d at 949–50; *Temu*, 740 F.3d at 892; *see also Cordova*, 759 F.3d at 340 (remanding for further consideration of the nexus requirement). We are compelled to do so again here.

10

Our decision in *Hernandez-Avalos* is particularly instructive in the present case. There, the BIA denied asylum to a petitioner who fled El Salvador after gang members threatened to kill her because she prevented her son from joining the gang. 784 F.3d at 946-47. The petitioner had argued that at least one central reason for her persecution was her nuclear family relationship with her son. *Id*. at 949. The BIA disagreed, holding that she actually was targeted because she did not consent to her son's criminal activity. *Id*.

We held that this application of the nexus requirement by the BIA was "excessively narrow," and explained that there was no meaningful distinction between the existence of a maternal relationship and a mother's decision to forbid her son from participating in a gang. *Id*. at 949–50. We held that the record compelled a factual conclusion that the petitioner's relationship with her son was a central reason for her persecution, because that relationship was the reason "why she, and not another person, was threatened." *Id*. at 950.

We likewise conclude in the present case that the BIA and IJ applied an improper and excessively narrow interpretation of the evidence relevant to the statutory nexus requirement. The BIA and IJ shortsightedly focused on Avila's articulated purpose of preventing Cantillano Cruz from contacting the police, while discounting the very relationship that prompted her to search for her husband, to confront Avila, and to express her intent to contact the police. *See Oliva*, 807 F.3d at 59-60 (although the applicant's refusal to pay the gang rent was the "immediate trigger" for an assault, the applicant's membership in the social group of individuals who left the gang led to threats, and thus the two reasons were linked). The BIA's and IJ's focus on the explanation

11

Avila gave for his threats, while failing to consider the intertwined reasons for those threats, manifests a misapplication of the statutory nexus standard.

The full record before us compels a conclusion that Avila's threats were motivated, in at least one central respect, by Cantillano Cruz's membership in Martinez's nuclear family. Although, as the IJ observed, any person interested in Martinez's disappearance may have confronted Avila concerning Martinez's whereabouts, this fact does not adequately explain the ongoing threats Avila made against Cantillano Cruz and her children over a period of two years at her home. *See Cordova*, 759 F.3d at 339-40 (although the applicant was first attacked by the persecutor to force the applicant to join the gang, the BIA failed to consider evidence showing that later attacks were motivated by family ties). Avila persisted in threatening Cantillano Cruz after she promised him that she would not contact the police. Avila placed threatening telephone calls to Cantillano Cruz at her home, the center of life for Martinez and his nuclear family. Also at the Martinez family's home, Avila and his associates killed the family's dogs, brandished and fired weapons, and threatened to harm Cantillano Cruz and her children.

In their failure to identify the nuclear family relationship as a central reason for Cantillano Cruz's persecution, the BIA and IJ further erred by giving weight to the fact that Avila did not threaten additional family members other than Martinez's uncle, Isaias. Neither Isaias nor Martinez's mother are members of Martinez's immediate, nuclear family, the only relevant social group. And Avila in fact threatened to harm all nuclear

12

family members of Johnny Martinez, specifically, his wife and children.[5]  Thus, the fact that other members of Martinez's extended family were not targeted "does not undermine" Cantillano Cruz's own fear of persecution.  *See Cordova*, 759 F.3d at 339; *Crespin-Valladares*, 632 F.3d at 127 n.6.

The record also unequivocally demonstrates that Cantillano Cruz knew about Avila's involvement with drugs and firearms trafficking as a result of her husband's communications with her.  Although Cantillano Cruz could not verify that Avila knew that Martinez had revealed this information to her, circumstantial evidence compels a conclusion that Avila at least suspected that Cantillano Cruz had such knowledge based on her marital relationship with Martinez.

This circumstantial evidence included the suspicious timing of the events surrounding Avila's threats.  Martinez informed Cantillano Cruz just one week before he left for his last "fishing trip" that he planned to stop working for Avila because of Avila's criminal activities.  After Martinez disappeared, Avila's threats against Cantillano Cruz began.  Cantillano Cruz testified repeatedly that Avila feared she would report "him" to police, not simply that she would alert authorities about Martinez's suspicious disappearance.  Additionally, Dr. Boerman opined that Cantillano Cruz was targeted

---

[5] With respect to the threats against Martinez's children, the IJ's findings were internally inconsistent.  *See Temu*, 740 F.3d at 891-92.  The IJ credited Cantillano Cruz's testimony, which included her repeated assertions that Avila threatened to harm her children.  However, the IJ also concluded that "the only other member" of Martinez's family who was threatened was Isaias.

13

because "Avila either knew or suspected that she had information about his criminal activities."

Without accounting for this extensive evidence, the BIA and the IJ essentially required that Cantillano Cruz prove that Avila's threats were based exclusively on her status as Martinez's wife. Such a requirement defies common sense.

In view of the above analytical deficiencies in the BIA's and IJ's reasoning, we conclude that that the record compels a conclusion that Cantillano Cruz's evidence satisfied the statutory nexus requirement. She conclusively has demonstrated that she was not threatened "for personal reasons or solely on general levels of crime and violence," as the BIA held. Instead, the record compels a finding that because of Cantillano Cruz's relationship with her husband, she was more likely than others to search for him and to contact the police based both on her knowledge of Avila's criminal activities and her husband's suspicious disappearance. Accordingly, we hold that any reasonable adjudicator would have been compelled to conclude that Cantillano Cruz's membership in Martinez's nuclear family was a central reason why she, and not another person, repeatedly was persecuted by Avila over a two-year period. *See Hernandez-Avalos*, 784 F.3d at 950. And, based on this determination, we further hold that the BIA's and IJ's conclusion that Cantillano Cruz failed to establish the statutory nexus requirement is manifestly contrary to law and an abuse of discretion. *See id*.

14

III.

In sum, we conclude that Cantillano Cruz established that any past persecution by Avila was "on account of" her membership in the nuclear family of Martinez. We therefore grant Cantillano Cruz's petition for review, reverse the BIA's determination that she failed to meet the statutory nexus requirement, and remand the case to the BIA for further proceedings regarding Cantillano Cruz's requests for relief from removal.[6]

PETITION FOR REVIEW GRANTED;
REMANDED FOR FURTHER PROCEEDINGS

---

[6] Based on our conclusion, we do not address the question whether Cantillano Cruz and her minor son separately have met the burden for CAT relief by demonstrating it is more likely than not they would be tortured if returned to Honduras. *See Ilunga v. Holder*, 777 F.3d 199, 214 n.5 (4th Cir. 2015). If the BIA declines to grant asylum or withholding of removal on remand, the BIA should reconsider her CAT claim in a manner consistent with the conclusions set forth in this opinion. *See id.*