**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-2291**

SINDY MARILU ALVAREZ LAGOS; K.D.A.A.,

      Petitioners,

      v.

WILLIAM P. BARR, Attorney General,

      Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: March 19, 2019                                  Decided: June 14, 2019

Before GREGORY, Chief Judge, and DIAZ and HARRIS, Circuit Judges.

Petition for review granted, reversed in part, vacated in part, and remanded for further proceedings by published opinion. Judge Harris wrote the opinion, in which Chief Judge Gregory and Judge Diaz joined.

**ARGUED:** Martine Elizabeth Cicconi, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Petitioners. Paul Fiorino, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Steven H. Schulman, David M. Coleman, Washington, D.C., Lauren Connell, Kate Powers, AKIN GUMP STRAUSS HAUER & FELD LLP, New York, New York, for Petitioners. Joseph H. Hunt, Assistant Attorney General, Rebekah Nahas, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

PAMELA HARRIS, Circuit Judge:

Sindy Marilu Alvarez Lagos testified credibly that she and her then-seven-year-old daughter, natives and citizens of Honduras, were threatened with gang rape, genital mutilation, and death if they did not comply with the extortionate demands of a Barrio 18 gang member. Unable to meet those demands and fearing for their lives, Alvarez Lagos and her daughter fled to the United States, where they sought asylum, withholding of removal, and protection under the Convention Against Torture.

Now, almost five years later, an immigration judge and the Board of Immigration Appeals have issued a total of three separate decisions denying Alvarez Lagos's claims. The government defends none of those decisions, including the most recent, which came after we agreed, at the government's request, to remand the case for reconsideration. Instead, the government admits that errors remain, but argues that we should leave them unaddressed and simply remand once again so that the agency may have a fourth opportunity to analyze Alvarez Lagos's claims correctly.

We decline that request. A remand is required here on certain questions that have yet to be answered, or answered fully, by the agency. But we take this opportunity to review the agency's disposition of other elements of Alvarez Lagos's claims. For the reasons given below, we reverse the agency's determination with respect to the "nexus" requirement for asylum and withholding of removal. And so that they will not recur on remand, we identify additional errors in the agency's analysis of the "protected ground" requirement for the same forms of relief, and in the agency's treatment of Alvarez Lagos's claim under the Convention Against Torture.

2

## I.

In August of 2014, shortly after her daughter's eighth birthday, Sindy Marilu Alvarez Lagos and her daughter entered the United States without authorization. The Department of Homeland Security soon served them with a notice to appear, charging them with removability on the ground that they were present in the United States without valid entry documents, *see* 8 U.S.C. § 1182(a)(7)(A)(i)(I). Alvarez Lagos conceded their removability, but applied for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and for protection under the Convention Against Torture ("CAT").

We begin by summarizing the testimony and evidence that Alvarez Lagos presented at her removal hearing and then outline the protracted legal proceedings that followed.

## A.

According to the evidence presented by Alvarez Lagos, she and her daughter lived in Tegucigalpa, Honduras before they fled to the United States. For several years, they lived in the city's Fuerzas Unidas neighborhood with Alvarez Lagos's husband. But in October of 2012, Alvarez Lagos and her husband separated, and she and her daughter moved to a different neighborhood to live with her brother and sister-in-law. That neighborhood – Altos del Divino Paraíso – is effectively controlled by the Barrio 18 gang: The gang monitors who enters and exits the neighborhood, controls when residents

3

can worship, collects taxes from residents, and kills individuals who disobey its commands.

In April of 2014, approximately 18 months after Alvarez Lagos separated from her husband, she was approached for the first time by Barrio 18, when a gang member known as "Chuta" accosted her as she walked alone in her neighborhood. Chuta asked Alvarez Lagos where her daughter was, and demanded that she pay him 2,000 lempiras (approximately $100 at the time). When Alvarez Lagos told Chuta that she did not have the money, Chuta called her a "whore," flashed a gun, and warned her of the consequences if she did not pay. Fearing that she and her daughter would be killed, Alvarez Lagos requested help from her family to gather the sum Chuta demanded. When she eventually delivered it to him, he praised her for being "obedient" and reminded her "what happens to women who don't obey." A.R. 561.

Approximately one month later, in May of 2014, Chuta again approached Alvarez Lagos while she was walking alone in the neighborhood and demanded that she pay him – this time, 10,000 lempiras (approximately $475 at the time). When Alvarez Lagos again told him that she could not afford to pay, he threatened to kidnap her daughter from school, and said he would "do whatever he [wanted]" to her daughter before killing her in front of Alvarez Lagos. A.R. 305. He would then "do whatever he please[d]" to Alvarez Lagos before killing her, too. *Id.* As a final warning, he reminded Alvarez Lagos of "what [the gang] do[es] to women," *id.*, which Alvarez Lagos, based on her knowledge of Barrio 18's crimes against women, understood to mean that she would be gang raped and her genitals mutilated if she did not pay.

4

Alvarez Lagos never reported her encounters with Chuta to the police because she feared that the police in her neighborhood were working with Barrio 18. Indeed, Chuta had confirmed as much when he threatened her, warning her that if she went to the police he would "kill [her] faster, because [the gang] [would] find out." A.R. 319. Instead, when she realized that she would not be able to meet Chuta's demands, Alvarez Lagos fled to the United States to save herself and her daughter.

At her removal hearing, Alvarez Lagos testified to the events that led to her flight to the United States from Honduras. She confirmed that she fears she and her daughter will be raped, tortured, and killed if returned to Honduras, noting that Barrio 18 members have continued to ask her family about her whereabouts since she fled. She also called Dr. Thomas J. Boerman, an expert on gangs in Honduras, to testify. Dr. Boerman opined that without husbands to protect them in Honduras's patriarchal society, unmarried women are especially vulnerable to gang attack, and that Barrio 18 targeted Alvarez Lagos because of her status as an unprotected female. Compounding the problem, he testified, Barrio 18 would view Alvarez Lagos's failure to comply with Chuta's demands as political opposition. As a result, Dr. Boerman concluded, Alvarez Lagos and her daughter would be "at high risk of egregious physical harm and death if returned to Honduras." A.R. 602.

Alvarez Lagos also submitted voluminous documentary evidence, including a declaration from Dr. Max Manwaring, a retired professor of military strategy at the U.S. Army War College. In his declaration, Dr. Manwaring confirmed that Alvarez Lagos was at greater risk of gang violence because of her status as a single mother and that the

5

gang would view any refusal to give in to its extortionate demands as a form of political disobedience.

**B.**

Based on that evidence, the agency issued three decisions – one from an immigration judge ("IJ") and two from the Board of Immigration Appeals ("the Board" or "BIA") – each denying Alvarez Lagos's claims. Alvarez Lagos argues that those decisions suffer from significant flaws. And notably, the government does not defend those decisions, admitting that the agency has yet to analyze Alvarez Lagos's claims correctly. The only dispute here is over the appropriate remedy: whether we should hold that the agency erred in reaching its conclusions, or, as the government urges, remand the case without addressing the agency's errors to allow the agency a fourth opportunity to consider Alvarez Lagos's claims. To provide context for our answer to that question, we briefly summarize the agency's three prior encounters with this case, and then the proceedings on this appeal.

1.

The IJ was the first to consider Alvarez Lagos's claims for asylum, withholding of removal, and CAT protection. After summarizing the evidence presented at the removal hearing, the IJ found that Alvarez Lagos had testified credibly, and that she had produced corroborating evidence in support of her claims. Nevertheless, the IJ denied each of those claims.

The IJ began with Alvarez Lagos's asylum claim. To qualify for asylum, as the IJ explained, an applicant must establish that she has been "subjected to past persecution" or

6

"has a well-founded fear of future persecution" "on account of" one of several grounds protected under the INA, including "race, religion, nationality, membership in a particular social group, or political opinion." *Tairou v. Whitaker*, 909 F.3d 702, 707 (4th Cir. 2018) (internal quotation marks omitted); *see also* 8 U.S.C. § 1101(a)(42)(A). Here, Alvarez Lagos argued that she was or will be persecuted on account of two protected grounds: her membership in a "particular social group," defined as unmarried mothers in Honduras living under the control of gangs; and the political opinion that Barrio 18 imputed to her, in the form of opposition to the gang's rule.

In support, Alvarez Lagos pointed to the testimony and declarations of her experts, who opined, based on their knowledge of gangs in Honduras, that Barrio 18 would view Alvarez Lagos's failure to comply with Chuta's demands as a form of political opposition and that the gang targeted Alvarez Lagos because she was an unmarried mother. And her encounters with Chuta, she argued, reflected that persecutory motive: When he approached Alvarez Lagos, Chuta not only exploited the fact that she was a parent by repeatedly threatening to kidnap and kill her daughter, but also focused specifically on the fact that she was a mother, using gender-based slurs like "whore" and making gender-based threats of rape and genital mutilation.

The IJ held, first, that neither of the reasons identified by Alvarez Lagos for her persecution qualified as protected grounds under the INA. Alvarez Lagos's proposed "particular social group" – unmarried mothers living under the control of gangs – was not legally cognizable, the IJ reasoned, because it was "not a small enough group," A.R. 256, because it required a "past experience of being an unmarried mother living under the rule

7

of gangs," A.R. 257, and because "[Alvarez Lagos's] evidence [] does not support that unmarried mothers are especially targeted," A.R. 256. The IJ also rejected the proposed group on the ground that "resistance to gang threats . . . is an amorphous characteristic" that is not sufficiently distinct. A.R. 256. As for "political opinion," the IJ determined, Alvarez Lagos had not shown that "her disobedience to Barrio 18[]" in fact "[was] politically motivated." A.R. 258.

In any event, the IJ went on to hold, even if Alvarez Lagos had identified a qualifying protected ground, she was ineligible for asylum for a second and independent reason: She had failed to satisfy the INA's "nexus" requirement, which requires that the persecution be *on account of* a protected ground. To meet that standard, the IJ explained, an applicant must show that a statutorily protected ground would be "one central reason" for the feared persecution. *Id.* Here, the IJ found, the only significant reason for Alvarez Lagos's persecution was general civil strife and private criminal activity in Honduras. Without addressing the relevant portions of the experts' testimony or the nature of Chuta's threats, the IJ rejected Alvarez Lagos's argument that her status as an unmarried mother and her imputed political opinion contributed centrally to her past or feared persecution.

The IJ turned next to Alvarez Lagos's claim for withholding of removal. Withholding of removal, like asylum, depends on the applicant's showing of persecution on account of a statutorily protected ground, but applies a more stringent standard of proof to that showing. *See Salgado-Sosa v. Sessions*, 882 F.3d 451, 456–57 (4th Cir. 2018). It follows, the IJ reasoned, that an applicant who has failed to satisfy the standard

8

of proof for asylum "is necessarily also unable to establish an entitlement to withholding of removal." A.R. 261 (internal quotation marks omitted). Accordingly, for the same reasons articulated in its asylum analysis, the IJ denied Alvarez Lagos's withholding of removal claim.

Finally, the IJ addressed Alvarez Lagos's CAT claim, and denied that, as well. To be eligible for CAT relief, an applicant must make two showings: First, the applicant must establish that "it is more likely than not" that if removed she will suffer "future mistreatment" – that is, she "will endure severe pain or suffering that is intentionally inflicted"; and second, the applicant "must show that this likely future mistreatment will occur at the hands of government or with the consent or acquiescence of government." *Cruz-Quintanilla v. Whitaker*, 914 F.3d 884, 886 (4th Cir. 2019) (internal quotation marks omitted). Considering general country conditions in Honduras and without fully addressing Alvarez Lagos's testimony or that of her experts, the IJ concluded that Alvarez Lagos had not made either showing, and so was not entitled to protection under the CAT.

2.

The second agency decision in this case was the Board's dismissal of Alvarez Lagos's appeal of the IJ's ruling. Alvarez Lagos argued on appeal that the IJ committed legal errors and arbitrarily ignored undisputed record evidence in analyzing her claims. The Board disagreed, and in a single-member opinion, "adopt[ed] and affirm[ed]" the IJ's decision. A.R. 145.

On the asylum and withholding of removal claims, the Board did not address the first ground for the IJ's holding: that Alvarez Lagos's proposed grounds were not protected under the INA. It did, however, address and add its own reasoning in support of the IJ's alternative finding that Alvarez Lagos had not established the necessary "nexus" between her proposed grounds and her persecution. According to the Board, the IJ did not clearly err in finding that "money and opportunity constituted the central reason why [Alvarez Lagos] was approached and extorted by Chuta." A.R. 146. Like the IJ, the Board did not discuss the nature of Chuta's threats or the relevant testimony of Alvarez Lagos's experts, and it did not consider whether the grounds Alvarez Lagos had identified were additional reasons why she, and not someone else, was targeted for extortion.

The Board also affirmed the IJ's denial of Alvarez Lagos's CAT claim, finding without elaboration that there was no error in the IJ's findings under either prong of the CAT analysis.

3.

That brings us to the third and final agency decision in this case, which came after a remand from this court. Following the Board's decision, Alvarez Lagos filed a petition for review in our court, and sought a stay of removal pending consideration of that appeal, which we granted. But three weeks before we were to hear oral argument, the government asked us to return the case to the Board for reconsideration of its nexus determination.

10

According to the government, a remand was appropriate so that the Board could take account of our then-recent decision in *Cruz v. Sessions*, 853 F.3d 122 (4th Cir. 2017), in which we applied established precedent to reverse an agency finding of lack of nexus. The Board, we held in *Cruz*, had adopted an "improper and excessively narrow interpretation" of the statutory nexus requirement, focusing solely on the "immediate trigger" for persecution. *Id.* at 129 (quoting *Oliva v. Lynch*, 807 F.3d 53, 59–60 (4th Cir. 2015)). But an applicant's protected status, we reminded the Board, need not be the "sole" or even the "dominant motivation for her persecution," *id.* at 127, and the record in that case compelled the conclusion that the protected ground of family membership was one of the "intertwined reasons" that a gang had targeted its threats against the applicant in question and not somebody else, *id.* at 129.

Alvarez Lagos did not oppose the motion, and so this court remanded to the Board "for consideration of [Alvarez Lagos's] asylum and withholding claims in light of" *Cruz*. A.R. 138. Before the agency, however, the government reversed course, arguing that *Cruz* had no bearing on this case. The Board agreed, and in another single-member decision, again found that Alvarez Lagos had not satisfied the nexus requirement for her asylum and withholding of removal claims. There was no clear error, the Board determined, in the IJ's finding that "the gang targeted [Alvarez Lagos] because of money," and not a protected ground. A.R. 4. And *Cruz* did not require any further inquiry, the Board reasoned, because "there is insufficient circumstantial evidence" in this case connecting Alvarez Lagos's persecution to her proposed protected grounds. *Id.* In support, the Board noted two facts: first, that Alvarez Lagos was unmarried for almost

11

two years before she first was approached by Chuta; and second, that gang members extort a large portion of the Honduran population. The Board again omitted any discussion of the nature of Chuta's threats or the relevant testimony of Alvarez Lagos's experts.

4.

After the Board issued its second decision, Alvarez Lagos again appealed to this court. To protect herself from being deported while we considered that appeal, she filed an emergency motion to stay her removal. Although the government had not opposed a stay during Alvarez Lagos's first appeal, it now took a different position, arguing that we should deny the motion because the Board had not erred in its second nexus determination. We granted the stay over the government's opposition.

At that point, the government reversed course again. Having just defended the Board's nexus finding, the government now conceded that it was legally "incomplete." Reply in Support of Respondent's Motion to Remand at 2. The Board, the government admitted, had overlooked material evidence in making that finding – including the nature of Chuta's threats and Dr. Boerman's expert testimony on the behavior of gangs – and had not considered whether there might be intertwined reasons for Alvarez Lagos's persecution. The government stopped short of confessing error. But it moved for a second remand, urging us to send the case back to the Board – without addressing any of Alvarez Lagos's claims on the merits – for yet another opportunity to assess the relevant record evidence, and to do so consistent with this court's precedent. We denied that motion, and instead went forward with this appeal.

## II.

"When, as here, the BIA affirms the IJ's decision with an opinion of its own, we review both decisions." *Salgado-Sosa*, 882 F.3d at 456. We review factual findings for substantial evidence, and will reverse them only if "any reasonable adjudicator would be compelled to conclude to the contrary." *Cabrera Vasquez v. Barr*, 919 F.3d 218, 222 (4th Cir. 2019) (internal quotation marks omitted); *see also* 8 U.S.C. § 1252(b)(4)(B). Legal determinations are reviewed de novo. *Salgado-Sosa*, 882 F.3d at 456. In the end, the agency's determination whether to grant relief is conclusive unless "manifestly contrary to law and an abuse of discretion." *Cortez-Mendez v. Whitaker*, 912 F.3d 205, 208 (4th Cir. 2019) (internal quotation marks omitted); *see also* 8 U.S.C. § 1252(b)(4)(D).

On appeal, Alvarez Lagos challenges the denial of all three of her claims – for asylum, withholding of removal, and protection under the CAT. Both asylum and withholding of removal, as noted above, are based on an applicant's showing of "persecution on account of a statutorily protected status." *Salgado-Sosa*, 882 F.3d at 456. We thus address those claims together before considering Alvarez Lagos's challenge to the denial of her CAT claim.

## III.

To be eligible for either asylum or withholding of removal, an applicant must establish that she has a status that is protected under the INA, and that a nexus exists

13

between that protected status and her persecution. The IJ concluded, and the Board affirmed, that Alvarez Lagos failed to make either showing. We agree with Alvarez Lagos and the government that the agency erred in making those determinations. We also agree with Alvarez Lagos that the record compels a conclusion that she has satisfied the nexus requirement. Accordingly, we vacate the denial of both claims, reverse the agency's determination as to nexus, and remand for further proceedings consistent with this opinion.[1]

### A.

We begin with the agency's finding that Alvarez Lagos failed to establish the required nexus between her persecution and her proposed protected statuses – that is, her membership in the "particular social group" of unmarried mothers living under the control of gangs in Honduras, and her imputed "political opinion." *See Oliva*, 807 F.3d at 59 (starting analysis with agency's nexus finding). The government, as noted above, does not defend that finding. Instead, the government agrees with Alvarez Lagos that the Board's analysis of this issue was flawed in significant respects: The Board failed to discuss Dr. Boerman's expert opinion that Alvarez Lagos "faces a higher risk of harm

---

[1] To the extent the IJ relied on a separate determination that Alvarez Lagos did not suffer "persecution" because she was only extorted and threatened with harm, but not yet "physically harmed," A.R. 260 n.12, that determination was erroneous. Our precedent makes clear that "[e]xtortion itself can constitute persecution, even if the targeted individual will be physically harmed only upon failure to pay." *Oliva*, 807 F.3d at 59. And we have made equally clear that "threat[s] of death" – like those Alvarez Lagos received – "qualif[y] as persecution." *Tairou*, 909 F.3d at 707 (internal quotation marks omitted); *see also Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015); *Crespin-Valladares v. Holder*, 632 F.3d 117, 126 (4th Cir. 2011).

14

because she is an unprotected woman in a country with high rates of gang violence against women," and also failed to address Alvarez Lagos's testimony regarding the nature – and in particular, the "gender-based" nature – of Chuta's threats. Respondent's Br. at 20. Moreover, without "confessing error," *id.* at 23, the government acknowledges that the Board has not yet considered, consistent with our case law, whether there is "evidence that Alvarez Lagos's status as a single mother was why she, 'and not another person, was threatened,'" *id.* at 24–25 (quoting *Salgado-Sosa*, 882 F.3d at 458).

The government's position is well taken; for the reasons the government gives, the Board's decision cannot stand. But that leaves the question of remedy, which the parties dispute. The government argues that we should do no more than remand the case to the Board for a second time, so that the agency may have another opportunity to "directly address this evidence in the first instance" and to "address this [c]ourt's nexus jurisprudence." *Id.* at 20–21. Alvarez Lagos, on the other hand, argues that "a second remand for the Board to do precisely what it was asked to do the first time around" is unnecessary, Petitioner's Reply Br. at 8 (emphasis omitted), because unchallenged record evidence compels the conclusion that her proposed protected grounds are "at least one central reason" for her persecution, and the court can address and reverse the agency's contrary finding. *Id.* at 4 (quoting *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 248–49 (4th Cir. 2017)). We agree with Alvarez Lagos.

As a general matter, when the Board errs, "the proper course . . . is to remand to the agency for additional investigation or explanation." *INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam) (internal quotation marks omitted). But that is not an invariable rule.

15

When a Board finding that an applicant failed to meet the statutory nexus requirement rests on a failure to consider all relevant record evidence, and that evidence, once considered, would compel "any reasonable adjudicator" to reach the opposite conclusion, then a remand is unnecessary, and we will reverse the Board's finding. *Cruz*, 853 F.3d at 130; *see id.* at 128 (listing other cases doing same); *see also Zavaleta-Policiano*, 873 F.3d at 248–50. That is the case here. Unchallenged record evidence compels the conclusion that the protected statuses identified by Alvarez Lagos are a central reason why she, and not some other person, was (or will be) targeted for extortion and threats, and we therefore reverse the Board's contrary finding.

It is well-settled that an applicant establishes the required nexus when she demonstrates that her proposed protected status "was or will be a central reason for [her] persecution." *Oliva*, 807 F.3d at 59 (emphasis and internal quotation marks omitted). The protected ground need not be the only reason – or even the dominant or primary reason – for the persecution. *Cruz*, 853 F.3d at 127. Rather, as we have repeatedly emphasized, it is enough that the protected ground be "*at least one* central reason" for the persecution, *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 950 (4th Cir. 2015) – that is, one central reason, perhaps "intertwined" with others, "why [the applicant], and not another person, was threatened," *Cruz*, 853 F.3d at 129 (internal quotation marks omitted).[2]

---

[2] The government argues that a second remand is appropriate so that the Board may consider our 2018 decision in *Salgado-Sosa*, another in our series of nexus cases, this one issued after the first remand for the Board's consideration of *Cruz*. But *Salgado-Sosa* breaks no new ground, simply reiterating and applying the same standards we applied in *Cruz* and *Hernandez-Avalos* and other prior precedent. *See Salgado-Sosa*, 882 (Continued)

Here, the record evidence compels the conclusion that Alvarez Lagos's membership in her proposed social group – unmarried mothers in Honduras living under the control of gangs – was one reason why she, and not another person, was threatened. To start, Alvarez Lagos's two experts said precisely that in explaining why Barrio 18 would focus on Alvarez Lagos's status in targeting her for persecution. Barrio 18, as Dr. Boerman testified, operates in a "very patriarchal," "very machista" culture "that largely sanctions violence against women." A.R. 357. And when a woman, like Alvarez Lagos, is unmarried and thus without the protection of a "dominant male," Dr. Boerman further explained, she is especially vulnerable to gang violence. A.R. 362–63. Indeed, the absence of a dominant male "predicts violence against women" in Honduras, making it "difficult to differentiate between the criminal victimization [Alvarez Lagos] experienced and her status as an unprotected female." A.R. 363. Echoing Dr. Boerman, Dr. Manwaring attested that Barrio 18 threatens "vulnerable groups like single mothers" in order to "demonstrate its power to the people living within its regime." A.R. 390–91.

Second, Alvarez Lagos's own testimony, deemed credible by the IJ, supported the conclusion that her status as an unmarried mother was at least one central reason why she, as opposed to another person, was targeted for extortion and threats. According to

F.3d at 457–59 (relying on *Hernandez-Avalos* as directly controlling). Nothing about *Salgado-Sosa*, in other words, changes the legal standard the Board was to apply after our last remand. Nor, contrary to the government's suggestion, does the Attorney General's recent decision in *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018), merit a remand on the nexus issue. That case clarifies the interpretation of "particular social group" – and so may be relevant to that question, which we take up next – but does not purport to change the standards for measuring nexus. *See id.* at 319.

17

Alvarez Lagos, she never felt vulnerable to Barrio 18 when she was married, and it was not until her marriage ended that Barrio 18 first threatened her. Alvarez Lagos's sister-in-law supported this account, explaining that she – a *married* mother – never had been targeted by Barrio 18 despite living in the very same house as Alvarez Lagos. And Alvarez Lagos's detailed description of her encounters with Chuta and the nature of his threats showed that Chuta deliberately preyed on Alvarez Lagos's status as a mother (threatening to kidnap and kill her daughter), as an unmarried mother (calling her a "whore," A.R. 302), and as a female (threatening to do to her what the gang "do[es] to women," A.R. 305). *See Temu v. Holder*, 740 F.3d 887, 891 (4th Cir. 2014) (nexus requirement satisfied where persecutors called the victim derogatory names and told him "this is how we treat people who are mentally ill like you" (alteration and internal quotation marks omitted)).

Similarly, the record evidence compels the conclusion that if, as Alvarez Lagos alleges, Barrio 18 has imputed to her an anti-gang political opinion, then that imputed opinion would be a central reason for likely persecution if she were returned to Honduras. On this point, Alvarez Lagos's experts were clear and unrebutted. Dr. Boerman explained that Alvarez Lagos's failure to comply with Chuta's extortionate demands and subsequent flight to the United States would be seen by Barrio 18 as "a direct challenge to its efforts to establish and maintain political domination within Honduras," A.R. 583, and that as a "direct result," A.R. 600, Alvarez Lagos would be "targeted for violence in a manner that was very graphic, and visible to the community," A.R. 363. Dr. Manwaring concurred, opining that Barrio 18 "sees [Alvarez Lagos's] failure to pay as a political act,

18

not simply a refusal to pay a debt," A.R. 397; that it feels compelled to "crush[]" what it views as political resistance, A.R. 390; and that as a result, Alvarez Lagos "reasonably fears persecution on account of her perceived political opposition to Barrio 18," A.R. 391.

None of this unrefuted evidence was considered in either of the Board's decisions finding that Alvarez Lagos had not established the requisite nexus between her persecution and her proposed protected statuses. Instead, in its second decision, the Board noted two record facts on which the IJ had relied for her nexus finding: that Alvarez Lagos was "unmarried for approximately two years" – actually for 18 months – "without being approached by gang members," and that "gang members target much of the [Honduran] population for extortion," most of whom are not unmarried mothers. A.R. 4. But as we have explained, that the "'criminal activities of [a gang] affect the population as a whole'. . . is simply 'beside the point' in evaluating an individual's particular claim." *Zavaleta-Policiano*, 873 F.3d at 248 (quoting *Crespin-Valladares v. Holder*, 632 F.3d 117, 127 (4th Cir. 2011)). And while the timing of threats can be relevant in determining a persecutor's motivation, *id.* at 249, it is not dispositive, particularly where there is a reasonable explanation for any delay – here, that it likely took time for the gang to identify Alvarez Lagos, who had moved to a new neighborhood, as an unmarried mother.[3]

---

[3] Relying largely on the same two facts as the Board, the government argues in the alternative that if the court does not remand this case to the agency, then it should deny the petition for review because substantial evidence supports the Board's finding of lack
(Continued)

The Board in this case "failed to appreciate, or even address, critical evidence in the record" bearing directly on the question of nexus, *Zavaleta-Policiano*, 873 F.3d at 248. When we view the case "holistically, with an eye to the full factual context," *Oliva*, 807 F.3d at 60, and in light of our well-established case law construing and applying the statutory "one central reason" standard, 8 U.S.C. § 1158(b)(1)(B)(i), we find that the undisputed record evidence compels the conclusion that Alvarez Lagos has satisfied the nexus requirement, and accordingly reverse the Board's contrary determination.

**B.**

We turn next to the IJ's alternative rationale for denying Alvarez Lagos's claims for asylum and withholding of removal: that neither of the grounds identified by Alvarez Lagos as central reasons for her persecution – her status as an unmarried mother living under the control of gangs in Honduras and the political opinion imputed to her by Barrio 18 – qualified as protected grounds under the INA. Again, the government does not defend the IJ's finding on appeal. Again, we agree with Alvarez Lagos that the IJ committed several significant legal errors in reaching its conclusion, affirmed by the Board without discussion. And again, the parties' main dispute is over the scope of our

---

of nexus. For the same reasons just given, we find that argument unpersuasive. While recognizing that we may not rely on a rationale other than that given by the agency, *see SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), the government also offers some additional support for the Board's nexus determination: "That Chuta asked for money during each encounter shows that his only motive was to make a profit." Respondent's Br. at 29. But an intent to extort may exist together and be "intertwined" with other reasons for targeting a particular victim; an intent to extort and persecution "on account of" a protected ground are not mutually exclusive. *See, e.g.*, *Zavaleta-Policiano*, 873 F.3d at 247–50; *Oliva*, 807 F.3d at 60.

20

remedy: Alvarez Lagos asks us to reverse the IJ's finding and hold that both her proposed grounds are protected under the statute, while the government asks us not to address the issue at all – and instead to remand – because the Board has yet to provide any analysis of the IJ's "protected ground" finding.

Because the Board "adopt[ed] and affirm[ed]" the IJ's opinion in full, A.R. 145, "the factual findings and reasoning contained in both decisions are subject to judicial review," *Ai Hua Chen v. Holder*, 742 F.3d 171, 177 (4th Cir. 2014) (internal quotation marks omitted), and contrary to the government's suggestion, we are authorized to address the question of protected grounds. But the government is correct that the Board discussed only the nexus requirement in its two decisions, and so we do not have the benefit of the Board's thinking on that subject. *See Ventura*, 537 U.S. at 17 (recognizing that the Board's "informed discussion and analysis" of an issue can "help a court later determine whether its decision exceeds the leeway that the law provides"). Moreover, developments in the law since the Board issued its second decision might affect the Board's reasoning on remand: In *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018), the Attorney General clarified the agency's interpretation of "particular social group," considering whether it extended to a proposed group of women who are unable to leave their relationships because of domestic abuse.

Accordingly, we apply the ordinary remand rule, vacating the agency decision on this issue and remanding for the Board to consider in the first instance whether Alvarez Lagos's proposed grounds are protected under the INA. Below, we identify the legal errors that affected the IJ's analysis so that they will not be repeated on remand.

21

1.

The first basis Alvarez Lagos proposed for her persecution was her membership in the "particular social group" of unmarried mothers living under the control of gangs in Honduras. To constitute a "particular social group" protected under the INA, a group must be "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Oliva*, 807 F.3d at 61 (internal quotation marks omitted). Here, the IJ assumed that Alvarez Lagos's proposed social group satisfied the immutability requirement, but held that it was neither "particular" nor "socially distinct."

In reaching that conclusion, the IJ committed a series of critical legal errors. First, at several points in the analysis, the IJ mischaracterized the group that Alvarez Lagos had identified. Instead of evaluating that group – unmarried mothers living under the control of gangs in Honduras – the IJ appears to have conflated Alvarez Lagos's proposed social group with her political opinion claim, leading her to conclude that "resistance to gang threats more broadly, [and] specifically the refusal or inability to comply with a demand for extortion money is an amorphous characteristic" that cannot qualify as a "particular social group." A.R. 256; *see also* A.R. 257 (referring to "a group of women who have exhibited defiance"). Whether or not the IJ is correct that "[a] group defined by its opposition to or refusal to support a gang or criminal organization" fails the "particularity" standard, A.R. 256, is irrelevant to an assessment of the group actually proposed by Alvarez Lagos: unmarried mothers living under the control of gangs in

22

Honduras. *See Crespin-Valladares*, 632 F.3d at 125 (holding that agency commits legal error by "reject[ing] a group different from that which the [applicant] proposed").

Second, the only other basis for the IJ's particularity determination – that "'unmarried mothers' is not a small enough group to establish a particular social group," A.R. 256 – is legally incorrect. As the government conceded in the agency proceedings in this case, "a putative particular social group need not be 'small' to possess particularity." A.R. 90. Size is relevant, the agency has explained, but it is not dispositive; "the key question is whether the proposed description is sufficiently particular or is too amorphous to create a benchmark for determining group membership." *Matter of S-E-G-*, 24 I. & N. Dec. 579, 584 (B.I.A. 2008) (alterations and internal quotation marks omitted). "[T]he size and breadth of a group alone does not preclude a group from qualifying as [a particular] social group," *Perdomo v. Holder*, 611 F.3d 662, 669 (9th Cir. 2010), and the IJ's contrary determination was in error.

The IJ's analysis of the "social distinction" requirement fares no better. According to the IJ, Alvarez Lagos's proposed group cannot satisfy that requirement because it "requires a past experience of being an unmarried mother living under the rule of gangs," and while "[s]hared past experiences may be relevant to a group's social distinction, [] they cannot define the group." A.R. 257. But as the government explained to this court in its initial brief on appeal, that is "inaccurate." Respondent's Brief at 13 n.2, *Alvarez Lagos v. Sessions*, No. 16-1426 (4th Cir. Sept. 30, 2016), ECF No. 29. Instead, the "Board has confirmed that a particular social group may be defined by a shared characteristic that 'in some circumstances . . . might be a shared past experience

23

such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis.'" *Id.* (emphasis omitted) (quoting *In re C-A-*, 23 I. & N. Dec. 951, 955 (B.I.A. 2006)). The IJ failed to acknowledge that standard or to conduct the necessary case-specific analysis, leading the government to decline to "defend the agency's finding on whether [Alvarez Lagos's] particular social group is legally cognizable." *Id.*

Finally, the IJ bolstered her finding on "social distinction" with the observation that "extortion and gang violence are prevalent throughout Honduras," and the statement that Alvarez Lagos's "evidence [] does not support that unmarried mothers are especially targeted." A.R. 256. As this court has made clear, however, the fact that "persecutors torture a wide swath of victims" is not enough to show that none of those victims are members of socially distinct groups. *Temu*, 740 F.3d at 893. And here, contrary to the IJ's suggestion, there is ample record evidence – which, at a minimum, required analysis by the IJ – indicating that Barrio 18 does indeed target victims on the basis of their membership in a socially distinct group of unmarried mothers: As we have explained already, Alvarez Lagos testified that she was threatened only after she separated from her husband; that her married sister-in-law never received similar threats, despite living in the same house; and that Chuta exploited both her parenthood and her gender in his threats against her. And Alvarez Lagos's experts corroborated that testimony, attesting that Alvarez Lagos was especially vulnerable to gang threats as a single mother and in the absence of a protective male presence.

24

2.

Alvarez Lagos also argues that if she is returned to Honduras, she will be persecuted on account of her imputed political opinion, a second protected ground. Her claim is straightforward: Barrio 18, she argues, will interpret her failure to pay Chuta and her flight to the United States as evidence that she possesses an anti-gang political opinion; and to punish that imputed political opinion and make an example of her, it will subject her to graphic violence on her return. But the IJ misinterpreted her claim, Alvarez Lagos contends, focusing its analysis on whether she in fact intended to express such an opinion and not on whether Barrio 18 would believe that she had. Again, we agree.

Claims of persecution on account of *imputed* political opinion differ in an important way from those involving *actual* political opinion. When, as here, an applicant claims that she has been or will be persecuted on account of an imputed political belief, then the relevant inquiry is not the political views sincerely held or expressed by the victim, but rather the persecutor's subjective perception of the victim's views. *See Haile v. Holder*, 456 F. App'x 275, 282–83 (4th Cir. 2011). The claim is examined from the perspective of the persecutor, not the victim, with the applicant required to show that her "persecutors actually imputed a political opinion" to her. *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 450–51 (4th Cir. 2007) (internal quotation marks omitted). It does not matter, in other words, whether the victim in fact held a particular political opinion; what matters is that she proves that her persecutors believed that she held that opinion.

Here, the IJ appears to have made a simple category mistake. Instead of analyzing whether Barrio 18 *believed* that Alvarez Lagos held an anti-gang political opinion, the IJ focused on whether Alvarez Lagos *actually* possessed that opinion. Alvarez Lagos's imputed political opinion claim was not cognizable under the INA, the IJ reasoned, because Alvarez Lagos had not demonstrated that she belonged to a particular political organization, or that she was politically motivated when she failed to pay Chuta and instead fled Honduras. *See* A.R. 257 ("[T]here is no evidence of her political opinion or membership in a specific recognized or known political group."); *id.* ("[Alvarez Lagos's] only expression of her opposition to Barrio 18's demands was to flee to the United States."); A.R. 258 ("[Alvarez Lagos] has not shown that her disobedience to Barrio 18's request . . . is politically motivated."). Those findings would be highly relevant to a claim based on actual political opinion, but they are not grounds for rejecting a claim based on imputed political opinion. In relying on them to dispose of Alvarez Lagos's second proposed protected ground – without ever addressing Alvarez Lagos's expert testimony regarding imputed political opinion – the agency "distort[ed] [and] disregard[ed] important aspects of [her] claim" and thus abused its discretion, *Orellana v. Barr*, ___ F.3d ___, 2019 WL 2219682, at *4 (4th Cir. May 23, 2019) (internal quotation marks omitted).

\* \* \*

Again, we leave it to the Board to analyze in the first instance whether Alvarez Lagos's proposed group of unmarried mothers living under the control of gangs in Honduras qualifies as a "particular social group," and whether Alvarez Lagos has

established an imputed political opinion protected by the INA. Those questions are not so free from doubt that we should resolve them ourselves without the benefit of the Board's views and assessment of the record evidence. At the same time, we urge the agency, on this fourth attempt, to address Alvarez Lagos's claims fully and with attention to all of the relevant evidence, avoiding any recurrence of the errors we have identified.

## IV.

Finally, we address Alvarez Lagos's challenge to the denial of her claim for protection under the CAT. Alvarez Lagos contends that the IJ and the Board erred by failing to meaningfully engage with the relevant evidence she presented in support of both the "future likely mistreatment" and "acquiescence" prongs of the CAT inquiry. We agree, and so vacate the denial of Alvarez Lagos's CAT claim and remand for further proceedings.[4]

---

[4] Alvarez Lagos urges us to go further and, instead of remanding, hold that she is eligible for protection. We decline to do so. This is a fact-intensive inquiry, and – in contrast to the nexus issue, addressed by the IJ and the Board on multiple occasions already – the Board has discussed it only briefly in one opinion. Moreover, neither the IJ nor the Board has made even initial findings regarding a third relevant consideration for CAT relief: whether Alvarez Lagos could safely relocate in another part of Honduras. *See* 8 C.F.R. § 1208.16(c)(3)(ii) (requiring consideration of all relevant evidence including "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured"). Accordingly, we remand to the Board to conduct this inquiry. We note, however, that Alvarez Lagos testified extensively at the removal hearing about the danger she would face even if relocated in Honduras. *See, e.g.*, A.R. 327 ("[I]f I will go and live with any family member, [Barrio 18] will find me."); A.R. 334 ("Because no matter where I move, [Barrio 18] will find me."); A.R. 552 ("Years pass, but Barrio 18 does not forget.").

As noted above, protection under the CAT requires an applicant to establish both that it is "more likely than not" that she will suffer "future mistreatment" so severe that it amounts to torture if she is returned to her home country, and that this "likely future mistreatment" will be inflicted by or with the "consent or acquiescence" of the government. *Cruz-Quintanilla*, 914 F.3d at 886 (internal quotation marks omitted). We have long recognized that "[t]hose who arrive at our border fleeing torture and seeking refuge under our laws have the right to know that the evidence they present of mistreatment in their home country will be fairly considered and weighed by those who decide their fate." *Cabrera Vasquez*, 919 F.3d at 223 (internal quotation marks omitted). Our role in protecting that right is clear: We must "ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the factfinder," and if that evidence is ignored, we must conclude that the agency has abused its discretion. *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 974 (4th Cir. 2019) (internal quotation marks omitted).

Here, the IJ and the Board overlooked or failed to address significant evidence presented by Alvarez Lagos in support of both her required showings. In addressing the "future likely mistreatment" prong of her CAT claim, the IJ – without discussing any of the evidence in the record – summarily concluded that Alvarez Lagos's "unsupported assumption" that she would be harmed if returned to Honduras "amount[ed] to speculation rather than evidence." A.R. 262. But Alvarez Lagos's fear that she would face harm upon her return to Honduras was far from an "unsupported assumption." Alvarez Lagos testified – and, as the IJ found, credibly so – that Chuta threatened to rape, mutilate, and murder both her and her daughter if she did not pay him. She also testified

28

that Barrio 18 members have continued to ask her family about her whereabouts since she fled. That testimony alone could be sufficient to sustain her burden as to future mistreatment. *See* 8 C.F.R. § 1208.16(c)(2) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."). But Alvarez Lagos did not stop there. She also presented the testimony and declarations of experts who corroborated her story, and explained that if she returned to Honduras, Barrio 18 members would exact revenge, punishing her in an especially "graphic" and "visible" manner for disobeying their commands. A.R. 363.

And in addressing the "acquiescence" prong of the CAT inquiry, the IJ omitted any mention of the substantial evidence marshalled by Alvarez Lagos to show that local government police officials acquiesce and indeed actively collude with Barrio 18 in her neighborhood. *See Zelaya v. Holder*, 668 F.3d 159, 168 (4th Cir. 2012) (vacating denial of CAT claim where agency failed to consider evidence of collaboration between local police and gang). Alvarez Lagos testified, for instance, that she believed local police and Barrio 18 "worked together" because the police were able to enter areas of the neighborhood accessible only with gang authorization, and because the police regularly refused to intervene when gang members shot residents. A.R. 321. Indeed, the IJ appeared to acknowledge that collaboration – but not its legal import – when she found that Alvarez Lagos credibly testified that she never reported Barrio 18's threats because "the police would inform the gangs." A.R. 262. Likewise, Dr. Manwaring, Alvarez Lagos's expert, explained multiple connections between Barrio 18 and "local police

29

power," including the sharing of information about neighborhood residents. A.R. 396–97.

Instead of addressing any of that evidence, the IJ focused on country condition reports showing that the Honduran government was having difficulties curbing widespread gang violence. That "generalized reporting," the IJ reasoned, "does not establish [Alvarez Lagos's] individualized claim" of acquiescence under the CAT. A.R. 262. But again, Alvarez Lagos was not relying solely or even primarily on evidence of general country conditions to support her claim; she was relying on extensive evidence of the specific conditions in her neighborhood, with which the agency never engaged. That "wholesale failure to [] consider" relevant and legally significant evidence, *Cabrera Vasquez*, 919 F.3d at 224 (internal quotation marks omitted), is an abuse of discretion, and so we must vacate the agency's denial of that claim, as well.

## V.

For the foregoing reasons, we grant the petition for review, vacate the denial of Alvarez Lagos's asylum, withholding of removal, and CAT claims, reverse the agency's determination on nexus, and remand for further proceedings consistent with this opinion. We also take the further step of retaining jurisdiction over Alvarez Lagos's appeal while the Board addresses the remaining issues on remand. *See Castañeda-Castillo v. Holder*, 638 F.3d 354, 363–64 (1st Cir. 2011) (collecting cases where courts have retained jurisdiction during remand to the Board). Alvarez Lagos's claims, as noted above, already have been the subject of three agency opinions and one remand from this court.

30

As a result, Alvarez Lagos and her daughter have been awaiting resolution of their claims for almost five years. "The need for a speedy resolution" of Alvarez Lagos's claims "is therefore exceptionally pressing on the facts of this case, and underwrites our retaining jurisdiction over the case while it is on remand to the BIA." *Id.* at 364. While we retain jurisdiction, our earlier order staying Alvarez Lagos's and her daughter's removal also will remain in effect. *See Mariscal-Sandoval v. Ashcroft*, 370 F.3d 851, 856 (9th Cir. 2004) (declining to vacate stay of removal until the court "no longer ha[s] jurisdiction over [the] case").

*PETITION FOR REVIEW GRANTED, REVERSED IN PART,*
*VACATED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS*