**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1849**

VERONICA TOLEDO-VASQUEZ,

      Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

      Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: December 7, 2021                            Decided: March 2, 2022

Before DIAZ and QUATTLEBAUM, Circuit Judges, and TRAXLER, Senior Circuit Judge.

Petition for review denied by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Diaz and Senior Judge Traxler joined.

**ARGUED:** Devon R. Senges, DUMMIT FRADIN, Greensboro, North Carolina, for Petitioner. Jessica Eden Burns, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Jeffrey Bossert Clark, Acting Assistant Attorney General, Keith I. McManus, Assistant Director, Edward C. Durant, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

QUATTLEBAUM, Circuit Judge:

Veronica Toledo-Vasquez petitions this Court to review an order from the Board of Immigration Appeals denying her application for asylum. The Board found that Veronica had not shown she was persecuted on account of her membership in her alleged particular social group, "family members of Guisela Toledo-Vasquez." Despite the tragic circumstances that caused Veronica to flee Mexico, substantial evidence supports the Board's conclusion that she was not persecuted on account of her family relationship with Guisela. Thus, we deny her petition for review.

I.

A.

Veronica, a citizen of Mexico, first came to the United States in 2002. While in the United States, she and her husband Francisco had three children. They occasionally visited Mexico, and when they did, they witnessed Rogelio Witrago abuse his wife, Guisela Toledo-Vasquez, who was also Veronica's sister.

In 2013, Veronica and Francisco returned to Mexico to open a meat market. Shortly after their return, Guisela separated from Rogelio. Rogelio responded maliciously. He took their children and hid them from Guisela. After Veronica and Guisela reported Rogelio to the police, the authorities confronted Rogelio about the children but were unable to secure the children's return to Guisela.

Guisela and Rogelio later reconciled for a short period of time. Despite that, Rogelio continued to beat her. One night after he had done so, Guisela called Veronica, asking for

2

her help. Veronica went with Francisco to Guisela's home. As Guisela and her kids entered Veronica's car, Rogelio screamed "[g]et the f[***] out and don't ever come back." A.R. 456–57. But then Rogelio pursued them. He intercepted Veronica's car and told Guisela to return home with the children or else she would make "things worse." A.R. 457. Veronica tried to stop Rogelio. She told him to leave her sister alone and that Guisela would not be going with him. Rogelio responded, "[y]ou better not get involved. You'll be better off not saying s[***] to me." A.R. 457. Fearing something worse could happen, Guisela returned with Rogelio.

Months later, Veronica, Guisela and their other sister Angelica attended a religious festival with their families. There, they encountered Rogelio, who was "very drunk." A.R. 457. He yelled "[y]ou didn't want to hang with us, go f[***] yourselves. You motherf[***]ers will see when I get home." A.R. 457. The next morning, at 2:00 AM, Guisela called Veronica to tell her that Rogelio had beat her. Veronica and Angelica then drove to Guisela's house where they found her, her children and Rogelio's mother all crying. Rogelio's mother asked Veronica to take Guisela away before Rogelio killed her. Earlier, when Rogelio's mother intervened to stop Rogelio from choking Guisela, Rogelio "hit her as well." A.R. 100.

Veronica and Angelica then took Guisela to their parents' house, but Rogelio followed them there. He broke into the house and began shouting for her. Fortunately, the police arrived and arrested Rogelio before he found Guisela. As he had done with Veronica, Rogelio threatened Angelica. He and his family members warned Angelica that if she did not leave Mexico, she would be killed.

Rogelio's arrest did not stop the abuse. After the police released him, he took Guisela's daughter. The police told Guisela that they could not return her daughter to her because Rogelio was the girl's father. Instead, they advised her to file for divorce. Rogelio eventually returned their daughter to Guisela.

Later, Rogelio took all the children with him into hiding and refused to tell Guisela where they were. He threatened Guisela and demanded that she withdraw her request for a divorce. This continued for about six months before the police developed a plan to trap Rogelio. They arranged for Guisela to set up a meeting with Rogelio to induce him out of hiding. Once Rogelio showed himself, the police would apprehend him. Francisco and two of his friends—Fidencio and Juan—agreed to assist the police. As planned, Rogelio revealed himself to Guisela, but then he discovered the trap and fled across a river. The police, Francisco and Francisco's friends pursued Rogelio. They found him hiding in a silo. The police arrested Rogelio and held him in custody for two months until he finally disclosed the whereabouts of the children. Because of his role in Rogelio's capture, Rogelio told Francisco's friend Fidencio that "he'd be the next one." A.R. 113–14.

After the police retrieved the children, the authorities told Guisela she would have to go to court to get custody of them. Veronica accompanied Guisela to court. There, Rogelio's sister told Veronica that she would be sorry for getting involved. Other members of Rogelio's family also showed up in court and made threatening hand gestures. Veronica called Francisco for help. When Francisco entered the courtroom, one of Rogelio's brothers-in-law asked him why he was there. After the hearing, the court returned the children to Guisela.

4

But the court's custody determination did not stop Rogelio. One night, only a few months after the court awarded custody of the children to Guisela, Rogelio's henchmen broke into Veronica's house and kidnapped Francisco. As the robbers fled with Francisco, Veronica noticed they were in Rogelio's truck. The next day, the authorities found Francisco dead from multiple gunshot wounds. They caught one of the robbers who confessed that Rogelio ordered them to kidnap Francisco.

Francisco's father pressed the police to prosecute Rogelio. Had it not been for her father-in-law, Veronica claims that Rogelio would have paid off the judge to avoid any consequences for the murder of her husband. Like everyone else who sought to stop Rogelio's threats and violence, Francisco's father began receiving threatening phone calls.

Veronica agreed to testify against Rogelio at his murder trial. Fearing retribution, she sent her two sons to the United States while she and her daughter went into hiding in another town. But Rogelio and his henchmen continued to threaten Veronica. Likewise, they threatened Fidencio because he planned to testify against Rogelio. On the eve of the trial, Veronica returned from hiding and went to stay at her parents' house. Finding it vandalized, she went to stay with an aunt and uncle.

As a result of Veronica's and others' testimony, Rogelio was convicted for murdering Francisco. But the threatening phone calls continued, causing Veronica to flee with her daughter to the United States.

## B.

When Veronica arrived in the United States, immigration authorities served her with a Notice to Appear charging her with being removable for entering the country illegally.

Veronica conceded that she entered the United States without authorization but alleged she should not be removed because she had a valid application for asylum.[1] Veronica alleged that she feared persecution based on her membership in the particular social group of "family members of Guisela Toledo Vasquez." A.R. 71. The immigration judge found that Veronica had failed to establish that she was persecuted on account of her kinship to Guisela. The immigration judge found that anyone helping Guisela and assisting the police in apprehending and imprisoning Rogelio would have been harmed. The immigration judge noted that nonfamily members had been targeted similarly for aiding Guisela. The judge also determined that the record showed that Rogelio's and his family's actions "amounted to 'retribution over purely personal matters,' rather than persecution on account of a protected ground." A.R. 73.

Veronica appealed the immigration judge's decision to the Board. The Board affirmed, finding that Veronica had not established that her kinship with Guisela was a central reason for her harm. In doing so, the Board incorporated that part of the immigration judge's decision regarding the nexus of Veronica's persecution. The Board agreed with the immigration judge that revenge motivated Rogelio's persecution of Veronica. It also determined that Rogelio's conduct involved a personal dispute among family members,

---

[1] Veronica also asserted claims for withholding of removal and protection under the Convention Against Torture but does not press the denial of those claims on appeal. Thus, we omit those claims from our discussion.

rather than persecution on account of a protected ground.[2] Veronica then timely petitioned this Court for review of the Board's decision. We have jurisdiction to review under 8 U.S.C. § 1252(a)(1).

## II.

Veronica argues that she met her burden of establishing that she suffered persecution on account of her kinship to Guisela. She contends that she, Francisco, Francisco's father and Angelica were all targeted as Guisela's family members. Such extended targeting, she insists, shows that this was not an interpersonal dispute between herself and Rogelio, but a dispute that spread to anyone who claimed to be a member of Guisela's family. She also argues that her relationship as Guisela's sister compelled her to help Guisela, making their family relationship a central reason she intervened. Even though Rogelio may have had other reasons for persecuting her, Veronica contends that at least one central reason for his doing so was her membership in Guisela's family.

---

[2] The Board affirmed the immigration judge's decision on the alternative ground that Veronica's alleged particular social group was not socially distinct "because most nuclear families are not inherently socially distinct." A.R. 3–4. The Board relied on *Matter of L-E-A-*, 27 I&N Dec. 581 (A.G. 2019), which has since been vacated by the Attorney General in *Matter of L-E-A-*, 28 I&N Dec. 304 (A.G. 2021), pending rulemaking to determine the meaning of "particular social group." *Cf.* 86 Fed. Reg. 8267, 8271 (Feb. 2, 2021) (requiring the Attorney General and Secretary of Homeland Security, by executive order, to promulgate regulations "addressing the circumstances in which a person should be considered a member of a 'particular social group'"). Because we can resolve this case on the nexus requirement, we need not review the Board's decision regarding whether Veronica alleged a particular social group.

7

A.

Before addressing the merits of Veronica's arguments, we review the Immigration and Nationality Act's provisions concerning asylum applications. The Act empowers the Secretary of Homeland Security and the Attorney General with discretion to grant asylum to any alien who qualifies as a "refugee." 8 U.S.C. § 1158(b)(1)(A); *see also Nolasco v. Garland*, 7 F.4th 180, 186 (4th Cir. 2021). "To qualify as a refugee, an applicant must demonstrate that he 'is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, [his native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Nolasco*, 7 F.4th at 186 (alterations in original) (quoting § 1101(a)(42)(A)); *see also* 8 U.S.C. § 1158(b)(1)(B)(i).

"Persecution occurs 'on account of' a protected ground if that ground serves as 'at least one central reason for' the feared persecution." *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015) (citations omitted).[3] "A central reason is not necessarily '*the* central reason or even a dominant central reason,' but it must be more than 'incidental, tangential, superficial, or subordinate' to another reason for harm." *Cedillos-Cedillos v. Barr*, 962 F.3d 817, 824 (4th Cir. 2020) (citation omitted). "As the Supreme Court has explained, the applicant 'must provide *some* evidence of [motive], direct or circumstantial.'" *Id.* (alteration in original). When determining whether the nexus has been

---

[3] The "on account of" requirement is commonly called the "nexus" requirement, and we use the different phrasings interchangeably. *See Perez Vasquez v. Garland*, 4 F.4th 213, 221 (4th Cir. 2021).

8

met, the ultimate question is "why [the applicant], and not another person," was persecuted. *Hernandez-Avalos*, 784 F.3d at 950; *see also Perez Vasquez v. Garland*, 4 F.4th 213, 222 (4th Cir. 2021) (noting that the proper inquiry is why the persecutor targeted the petitioner).

Our role in reviewing whether Veronica met the nexus requirement is limited. "Because this is a factual finding, our task is not to decide how we would rule in the first instance. Rather, we must uphold the [Board]'s finding unless no rational factfinder could reach the same conclusion." *Cedillos-Cedillos*, 962 F.3d at 824 (quoting *Temu v. Holder*, 740 F.3d 887, 891 (4th Cir. 2014)). Stated differently, we review whether the Board's conclusion is "supported by reasonable, substantial, and probative evidence." *Cruz v. Sessions*, 853 F.3d 122, 128 (4th Cir. 2017) (citation omitted). Substantial evidence is a "highly deferential" standard of review. *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020). It requires us to affirm if there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Therefore, we will reverse the factual findings from below "only if 'any reasonable adjudicator would be compelled to conclude to the contrary.'" *Alvarez Lagos v. Barr*, 927 F.3d 236, 248 (4th Cir. 2019) (citation omitted).

## B.

Applying that standard of review to Veronica's claim, our question is whether substantial evidence in the record supports the Board's decision that Veronica was not targeted on account of her membership in the group "family members of Guisela Toledo-

Vasquez."[4] The record would not compel a reasonable adjudicator to conclude that Veronica's membership in Guisela's family was anything more than incidental, tangential, superficial and subordinate to another reason for Rogelio to harm her. In contrast, the record contains substantial evidence that central reasons for Veronica's persecution included her intervening in Guisela's and Rogelio's marriage, aiding her sister in escaping Rogelio and assisting in Rogelio's capture and imprisonment.

1.

As both the Board and immigration judge noted, every threat made by Rogelio to Veronica came after her attempts to rescue Guisela from Rogelio's abuse. Whether it was attempting to help Guisela escape when Rogelio beat her or testifying at legal proceedings, Veronica's efforts to help Guisela enraged Rogelio and triggered his persecution of Veronica. On the other hand, the alleged basis for the persecution—the family relationship between Veronica and Guisela—was never an issue during the time Veronica spent in Mexico throughout 2002 to 2013. Nor was it an issue after she returned when she was not trying to help Guisela with her problems with Rogelio. Rogelio targeted Veronica only after her efforts to help Guisela. The "timing of threats can be relevant in determining a persecutor's motivation." *Alvarez Lagos*, 927 F.3d at 251. Here, the timing of Rogelio's

_____

[4] The Board adopted and affirmed the immigration judge's finding that Veronica did not show persecution on account of a protected ground and supplemented its own reasoning. In such cases, we review both the Board's and the immigration judge's decisions. *Arita-Deras v. Wilkinson*, 990 F.3d 350, 356 (4th Cir. 2021). In doing so, "we limit our consideration of the [immigration judge]'s opinion to the portions that have been adopted and incorporated into the Board's decision." *Id.*

persecution indicates it was motivated by Veronica's intervention in Rogelio's marriage since the threats never occurred before, but only directly after, she intervened.

Supporting this conclusion is Rogelio's treatment of other family members. Rogelio threatened Angelica only after she provided Guisela shelter. Rogelio targeted, and ultimately murdered, Francisco only after he helped Guisela escape from Rogelio's abuse, aided the police in capturing Rogelio and protected Veronica and Guisela from the threats of Rogelio's family members during the custody proceedings. Rogelio even hit his own mother but only after she intervened to stop him from choking Guisela. Nothing in the record suggests that any of Guisela's family members were subjected to Rogelio's wrath until they attempted to help Guisela. But if their family membership was the reason for Rogelio's persecution, they should have been targeted long before they intervened in his affairs.[5]

Further supporting the Board's decision is that Rogelio treated nonfamily members who intervened the same way. Rogelio threatened Francisco's father after he pressed the authorities to prosecute Rogelio for Francisco's murder. He threatened Francisco's friend, Fidencio, after Fidencio helped Francisco and the police capture Rogelio. Once again, whether family or not, Rogelio targeted anyone and everyone who aided Guisela or otherwise acted against him. If you did that, Rogelio was an equal opportunity persecutor. If you stayed out of his business, he left you alone.

---

[5] Veronica defines Guisela's family to include not only herself and Angelica, who are Guisela's sisters, but also Guisela's brother-in-law Francisco, Rogelio and Rogelio's mother. She acknowledges that Francisco's father and Francisco's friend, Fidencio, are not members of Guisela's family.

In addition, Veronica's testimony supports the conclusions of the immigration judge and the Board. In her asylum application, Veronica wrote that she was targeted because she "tried to help [her] sister and her children escape her abusive husband." A.R. 441 (original capitalized in full). She further explained that she believed Rogelio and his family would "take revenge on me or my children for testifying against him in court." A.R. 441 (original capitalized in full). Before the immigration judge, Veronica affirmed that Rogelio would not have persecuted her if she had not intervened in the familial dispute between Guisela and Rogelio involving custody and divorce.

Importantly, "[n]ot every threat that references a family member is made on account of family ties." *Hernandez-Avalos*, 784 F.3d at 950 n.7. Our *Cedillos-Cedillos* decision illustrates this point. There, an applicant witnessed gang members murder his brother. 962 F.3d at 820. The gang members pursued him three separate times after which he fled to the United States. *Id.* at 821. We rejected the claim that the gang members' persecution was based on the applicant's family relationship with his brother, reasoning that the record did not support the conclusion that he faced persecution for any reason other than the fact that he was a witness to the murder. *Id.* at 824. We explained that "substantial evidence indicates that the threats made to [the applicant] could have been directed at any person who witnessed his brother's killing." *Id.* at 826. The threats were "entirely consistent with a motivation independent of [the applicant's] family ties." *Id.* Here, the record likewise does not compel us to conclude that a central reason Veronica was targeted was because she was Guisela's sister. Instead, Veronica was targeted because she intervened against Rogelio's interests in aiding her sister.

12

## 2.

Veronica insists that our precedent compels the conclusion that she was targeted on account of her family membership. That precedent, she points out, warns against an exceedingly narrow view of the nexus requirement and declares that there can be more than one central reason for persecution. In advancing these arguments, Veronica relies on our decisions in *Hernandez-Avalos* and *Cruz*, where we found persecution on account of family membership. In *Hernandez-Avalos*, gang members threatened a mother that they would kill her if she prevented her son joining their gang. 784 F.3d at 947–48. The mother sought asylum, arguing she was persecuted and feared future persecution on account of her membership in a nuclear family. *Id.* at 949. The Board rejected that claim, finding that the mother was not threatened on account of her membership in her son's nuclear family but instead because she refused to allow her son to join the gang. We found this reasoning "excessively narrow," pointing out that there can be more than one central reason for the persecution. *Id.* at 949–50. Focusing on the fact that "the gang members' demands leveraged her maternal authority to control her son's activities," we held the mother's relationship with her son was why she, and not another person, was targeted by the gang members. *Id.* at 950. There was "no evidence that [the mother] would have been selected as the recipient of those threats absent that familial connection." *Id.* at 950 n.7.

Veronica's case is distinguishable from *Hernandez-Avalos*. Here, Rogelio not only persecuted Veronica and other members of Guisela's family. He also persecuted nonfamily members who, like Veronica, attempted to help Guisela. In contrast, the gang members in *Hernandez-Avalos* did not persecute anyone other than the young boy's mother in an

13

attempt to ensure that he joined their gang. For example, there was no evidence that friends of the mother who also discouraged the son from joining the gang were persecuted. Also, unlike *Hernandez-Avalos*, Rogelio did not attempt to leverage Veronica's familial relationship to her sister for gain. Instead, he targeted Veronica to stop her from interfering in his affairs.

Turning now to *Cruz*, there a drug trafficker threatened to kill the wife and children of his bodyguard after the bodyguard's wife continued to inquire into the disappearance of her husband who had not returned from a trip with the drug trafficker. 853 F.3d at 125–26. Although the wife told the drug trafficker that she did not intend to contact the police regarding her husband's disappearance, the threats became worse. The drug trafficker and his associates loitered outside her home on several occasions, brandishing and firing weapons, and killed the family's dogs. *Id.* at 125. The Board rejected the wife's claim that she had been persecuted on account of her membership in her husband's nuclear family. *Id.* at 127. It found that she was threatened "to deter her from contacting the police" and that the "threats constituted harm meted out by a private actor for personal reasons or solely on general levels of crime and violence in Honduras, which were insufficient bases to demonstrate eligibility for asylum." *Id.* 126–27 (internal alterations and quotations omitted). We again reversed the Board, finding that it had "applied an improper and excessively narrow interpretation of the evidence relevant to the statutory nexus requirement." *Id.* at 129. Specifically, the Board "shortsightedly focused" on the drug trafficker's purpose in preventing the wife from going to the police "while discounting the very relationship that prompted her to search for her husband, to confront [the drug

14

trafficker], and to express her intent to contact the police." *Id.* While any person interested in the husband's disappearance may also have confronted the drug trafficker about the husband's disappearance, "this fact d[id] not adequately explain" the drug trafficker's ongoing threats against the wife *and* her children over the course of two years and long after the wife had told the drug trafficker that she had no plans of reporting her husband's disappearance. *Id.* We held that this evidence compelled the conclusion that a central reason the wife was targeted was her relationship to her husband. *Id.*

But *Cruz* is also distinguishable from the case we consider today in three important respects. First, in *Cruz,* only family members were targeted. In contrast, Rogelio persecuted family members and nonfamily members alike. Thus, the common denominator in who he persecuted was not family relationship; it was whether the person had sought to help Guisela or hinder him.

Second, whereas the persecution in *Cruz* continued long after the wife assured the drug traffickers that she would not report her husband's disappearance to the police, here Rogelio persecuted family members and nonfamily members immediately following their efforts to help Guisela.

Third, and perhaps most importantly, the persecutor in *Cruz* (as well as in *Hernandez-Avalos*) was not a member of the alleged particular social group. Rogelio, in contrast, is a member of the family that Veronica alleges to be the basis for her persecution—family members of Guisela. This fact makes this case similar to our decision in *Velasquez v. Sessions*, 866 F.3d 188 (4th Cir. 2017). There, the grandmother of a child demanded custody of the child from his mother, and each request "became more forceful,"

15

to the point that the grandmother kidnapped the child and threatened to kill the mother if not given custody. *Id.* at 192. After the mother had fled to the United States, but before the grandmother realized this, the grandmother instructed her son to murder the mother, but he instead murdered the mother's sister in a case of mistaken identity. *Id.* at 192. We concluded that the mother's persecution "was a private and purely personal dispute between grandmother and mother regarding [the child]." *Id.* at 196. Important to that conclusion was the fact that the dispute did "not involve outside or non-familial actors engaged in persecution for non-personal reasons, such as gang recruitment or revenge." *Id.* And we made clear that asylum "was not intended as a panacea for the numerous personal altercations that invariably characterize economic and social relationships." *Id*. 195 (quoting *Saldarriaga v. Gonzales*, 402 F.3d 461, 467 (4th Cir. 2005)). Asylum does not provide protection from persecution that springs from "a personal conflict between . . . family members." *Id.* at 196.

We see no meaningful differences between *Velasquez* and Veronica's claim. Like the mother and grandmother in *Velasquez*, Veronica and Rogelio are family members. Therefore, this case does "not involve outside or non-familial actors engaged in persecution for non-personal reasons, such as gang recruitment or revenge." *Id.* Just as the dispute between the mother and grandmother in *Velasquez* involved private and personal matters, so does Veronica's and Rogelio's dispute since it concerns Veronica intervening in Guisela's and Rogelio's marriage. In short, nothing in the record compels us to conclude that this is not a private and purely personal dispute to which asylum does not apply. What's more, Veronica cannot point us to any case in this Circuit or decision from the Board

16

finding that the nexus of persecution is family membership when the persecutor is himself a family member. We decline to expand asylum relief to such uncharted waters.[6]

III.

Our decision today should not be construed to minimize the courageous love that motivated Veronica nor the tragic circumstances presented here. The record suggests that Guisela could not have asked for a better sister. Veronica placed her life in jeopardy to save her sister. Likewise, her husband's brave actions cost him his life. But we have emphasized time and again that the nexus requirement is primarily about the persecutor's reasons for targeting an individual. *E.g., Cedillos-Cedillos*, 962 F.3d at 824–25; *Alvarez Lagos*, 927 F.3d at 254 (noting that "the claim is examined from the perspective of the persecutor, not the victim," so that the persecutor's subjective understanding is what is relevant); *Cruz*,

---

[6] Veronica also cites to *Zavaleta-Policiano v. Sessions*, 873 F.3d 241 (4th Cir. 2017) and *Hernandez-Cartagena v. Barr*, 977 F.3d 316 (4th Cir. 2020), but these are distinguishable as well. In both cases, the applicant's parents immigrated to the United States from a country in Central America. Shortly after the parents' departure, gang members approached their adult children, demanding payment or else they would be harmed. Each applicant sought asylum on the basis that they were persecuted on account of their membership in their nuclear family. We held that each record contained substantial evidence that compelled us to conclude that the persecution was on account of the applicant's family membership. We noted that in each case the gang members sought out the applicants specifically because they were the children of parents who could afford to remit payments in exchange for the gang members leaving their children unharmed. Like *Hernandez-Avalos*, the gang members leveraged the applicants' relationship to their parents, such that their family relationships were the reason why they, and not others, were targeted. In contrast, neither Rogelio, nor any other individual, sought to leverage Veronica's relationship to her sister. Rogelio targeted Veronica in response to her intervening in Rogelio's affairs. Critically, she was only targeted after intervening. Thus, her case is different from the applicants in *Zavaleta-Policiano* and *Hernandez-Cartagena*.

17

853 F.3d at 128; *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164 (4th Cir. 2009); *see also In re J-B-N-*, 24 I&N Dec. 208, 214 (BIA 2007) (defining the nexus requirement's focus as on the persecutor's motivation). Here, the record contains substantial evidence to support the Board's decision that Veronica's membership in Guisela's family was not a central reason for her persecution. The record suggests that had Veronica been someone else, and not a family member, she would have been targeted just the same. When nonfamily members, like Francisco's father and Fidencio, intervened in Rogelio's affairs, they suffered the same fate. Because of that, Veronica's family membership to Guisela is merely an incidental, tangential, superficial and subordinate reason for her persecution. Thus, it is not enough to meet the "on account of" requirement. For the reasons outlined above, Veronica's petition for review is

*DENIED*.