**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 20-2072**

———————

MAIRA JUDITH MADRID-MONTOYA,

      Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

      Respondent.

———————

On Petition for Review of an Order of the Board of Immigration Appeals.

———————

Argued: September 13, 2022                               Decided: October 31, 2022

———————

Before AGEE, RICHARDSON, and RUSHING, Circuit Judges.

———————

Petition for review denied by published opinion. Judge Agee wrote the opinion, in which Judge Richardson and Judge Rushing joined.

———————

**ARGUED:** Aaron Robert Caruso, ABOD & CARUSO, LLC, Wheaton, Maryland, for Petitioner. Dawn S. Conrad, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Brian M. Boynton, Acting Assistant Attorney General, Mary Jane Candaux, Assistant Director, Remi Da Rocha-Afodu, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

———————

AGEE, Circuit Judge:

Maira Judith Madrid-Montoya ("Petitioner") sought asylum and withholding of removal under the Immigration and Nationality Act ("INA") after conceding removability from the United States during removal proceedings before an Immigration Judge ("IJ").[1] The IJ denied both forms of relief, and the Board of Immigration Appeals ("BIA") affirmed and entered a final order of removal. The crux of this appeal is the BIA's determination that Petitioner failed to show the requisite nexus between her asserted protected ground and the persecution she suffered. Because that finding is supported by substantial evidence, we deny the petition for review.

I.

A.

Petitioner is a Honduran native and citizen. From 2008 to 2013, she and her daughter lived with Germain Puentes Urbina. He was the father of Petitioner's daughter and, though Petitioner and Urbina were never formally married, Petitioner referred to him as her "husband." *E.g.*, A.R. 74.

Urbina owned about twenty hectares of land upon which he farmed corn and beans. The residence that Urbina, Petitioner, and their daughter occupied was also on that land. In August 2013, narcotraffickers from a local Honduran gang told Urbina to "leave the area"

---

[1] Petitioner's daughter filed a rider application for asylum and withholding of removal. Since her application rises and falls upon the success of her mother's, we adopt the parties' convention of referring to Madrid-Montoya as a singular "Petitioner."

2

so that they could use the entire twenty hectares and adjacent properties to build a landing strip for their drug trafficking operations. A.R. 81. Urbina refused to leave. Five days later, the narcotraffickers returned to the property and killed him. Fearing for her and her daughter's lives, Petitioner fled to her aunt's house in a city two hours away.

The record shows that Urbina was only one of several landowners the narcotraffickers targeted. Petitioner testified[2] that around the same time as Urbina's murder, narcotraffickers forced "several" of Urbina's neighbors off their land so they could build their desired landing strip. A.R. 103. Those neighbors vacated their land as directed, and none of them were harmed. Petitioner also later learned that the narcotraffickers completed construction of that landing strip and "sent out a form of communication saying that nobody" could return to the land that was once theirs. A.R. 94. Petitioner explained, "You can't do anything there. [The narcotraffickers] don't allow for you to put any cattle or anything in [sic] that property. So everybody's scared to do anything there." A.R. 93.

About fifteen months after moving in with her aunt, Petitioner received a phone call from an unidentified man. She testified that the man "said that this was in reference to the people that killed the father of my daughter, and that I should leave the area." A.R. 89. The man reiterated that Petitioner "had to leave the city that [she] was living in because if not, [she] would be a victim the same way as the father of [her] daughter." A.R. 90. Petitioner testified, "That's all they told me, and then they hung up." *Id.*

---

[2] The IJ did not make an explicit credibility determination; it only assumed Petitioner's testimony was credible. *See* A.R. 40. The Government does not question Petitioner's credibility on appeal, so we do not explore the issue further.

3

Fearing that the narcotraffickers would follow up on this threat even if she reported it to the police, Petitioner and her daughter relocated to another family member's home, which was five hours away from Urbina's property. For the months that she lived there, Petitioner received no more threatening phone calls or contacts from the narcotraffickers. Indeed, Petitioner admitted during her testimony that the narcotraffickers "didn't know" where she had been living. A.R. 101. But because of her fear that the narcotraffickers would continue searching for her and "keep threatening [her]," she and her daughter relocated to the United States. A.R. 93.

Petitioner testified that if she and her daughter were returned to Honduras, they would "live . . . in constant fear" of the narcotraffickers. A.R. 96. She believes they would "investigate" her and her daughter's whereabouts and discover that they had returned from the United States, A.R. 104. When asked why the narcotraffickers would be "interested" in her and her daughter, Petitioner replied, "Because they think that I'm going to go back and take over the property that belonged to my husband." A.R. 97. That testimony aligned with what she told border officials during her initial credible fear interview: that the narcotraffickers "wanted to harm [her]" because "they were thinking that one day I could take [the land] away." A.R. 299.

However, Petitioner has no legal claim to Urbina's property because she was never married to him. Instead, Petitioner's minor daughter is the rightful heir, but there is no evidence in the record reflecting whether the narcotraffickers that threatened Petitioner knew that she had no legal claim of ownership.

4

B.

Petitioner applied for asylum and withholding of removal during her removal proceedings before the IJ.[3] She claimed that if she were removed from the United States to Honduras, she would be persecuted on account of her membership in the particular social group ("PSG") of the "[f]amily of Germain Puentes Urbina." A.R. 71.

After receiving Petitioner's testimony and other documentary evidence, the IJ issued an oral decision denying her applications for asylum and withholding of removal. The IJ first found that Petitioner "fail[ed] to show past persecution or that there is a reasonable probability of [future] harm." A.R. 40. The IJ also found that Petitioner did not show that the Honduran government would be unwilling or unable to protect her from her feared persecution if removed there.

The BIA affirmed each of the IJ's rulings and also determined that Petitioner's asylum and withholding of removal claims failed because "the family relationship in this case has not been shown to be a reason for the claimed harm." A.R. 4. The BIA reasoned that "the drug traffickers targeted [Urbina] and his family not because of their familial relationship, per se, but because these criminals wanted to take [his] land." *Id.* "[T]his land dispute," the BIA concluded, "is not a protected ground to demonstrate eligibility for asylum" and withholding of removal. *Id.*

---

[3] Petitioner also sought protection from removal under the Convention Against Torture, but her petition for review does not challenge the BIA's denial of that relief, so it is not at issue before us. *See Canales-Rivera v. Barr*, 948 F.3d 649, 656 n.3 (4th Cir. 2020) (finding a waiver under identical circumstances).

Petitioner timely petitioned for review in this Court. We have jurisdiction under 8 U.S.C. § 1252(a)(1).

II.

Applications for asylum and for withholding of removal under the INA are similar in several key respects. *See Salgado-Sosa v. Sessions*, 882 F.3d 451, 456–57 (4th Cir. 2018) (explaining these similarities and differences in detail). Relevant to this case, one necessary element for both forms of relief is that an applicant's claimed persecution occurred, or will occur, on account of a statutorily protected ground that applies to her. 8 U.S.C. § 1101(a)(42) (asylum); *see id.* § 1231(b)(3)(A) (withholding of removal). We have referred to this as the "nexus requirement." *E.g.*, *Oliva v. Lynch*, 807 F.3d 53, 59 (4th Cir. 2015). If an applicant fails to satisfy the nexus requirement, she cannot obtain asylum or withholding of removal. *See Mirisawo v. Holder*, 599 F.3d 391, 396 (4th Cir. 2010) ("[A]n applicant who fails to meet the lower standard for showing eligibility for asylum will be unable to satisfy the higher standard for showing withholding of removal.").

A nexus exists between an applicant's protected ground and her persecution if the protected ground was or will be "at least one central reason" for persecuting her. 8 U.S.C. § 1158(b)(1)(B)(i); *Diaz de Gomez v. Wilkinson*, 987 F.3d 359, 363 (4th Cir. 2021). "The applicant need not prove that the protected ground was *the* central reason or even a dominant central reason for persecution," although the protected ground must at least be "more than an incidental, tangential, superficial, or subordinate reason." *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 247 (4th Cir. 2017) (cleaned up).

6

Whether an applicant has shown a nexus between her protected ground and alleged persecution is "a classic factual question." *Crespin-Valladares v. Holder*, 632 F.3d 117, 127–28 (4th Cir. 2011). And the standard of review accompanying factual questions in this context is consequential. "We review factual findings for substantial evidence," which means we treat "them as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Portillo Flores v. Garland*, 3 F.4th 615, 626 (4th Cir. 2021) (en banc) (citation omitted); *see* 8 U.S.C. § 1252(b)(4)(B). Under this "highly deferential" standard of review, *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020), we cannot substitute our judgment for that of the agency's by "reweigh[ing] the evidence and determin[ing] which of the competing views is more compelling," *Mulyani v. Holder*, 771 F.3d 190, 200 (4th Cir. 2014). Instead, if "the record plausibly could support two results: the one the [agency] chose and the one [the petitioner] advances," we must defer to the agency. *Niang v. Gonzales*, 492 F.3d 505, 511 (4th Cir. 2007).

## III.

The only protected ground that Petitioner relied upon in her application before the IJ was her membership in the PSG "Family of Germain Puentes Urbina." A.R. 71. Before this Court, the Government has conceded both that this PSG is cognizable and that under our recent precedent a single death threat can establish past persecution. So the pivotal question now is whether Petitioner has shown reversible error in the BIA's determination that she failed to prove a nexus between her PSG and that death threat.

7

Petitioner contends that the BIA made such a reversible error for two reasons.[4] First, she asserts that the BIA employed an incorrect legal standard in reaching its nexus finding. Second, she argues that our recent nexus case law compels the conclusion that her familial ties to Urbina were at least one central reason for her persecution. We address each contention in turn.

A.

Petitioner begins by asserting that the BIA's nexus finding is erroneous because the agency applied an incorrect legal standard. We review this narrow legal issue de novo. *Perez Vasquez v. Garland*, 4 F.4th 213, 221 (4th Cir. 2021).

As previously noted, a nexus exists between a protected ground and persecution if the protected ground was "at least one central reason" for the persecution. 8 U.S.C. § 1158(b)(1)(B)(i). Petitioner contends that the BIA did not apply this standard. She claims the agency improperly focused on "the 'trigger' issue of the drug trafficker's desire for land," when it should have asked "why was Petitioner, as opposed to some other person, persecuted." Supp. Opening Br. 20–21.

In recent decisions, we have emphasized that when engaging in a nexus analysis, the BIA must focus on whether a petitioner's "membership [in a PSG] is 'a central reason why she, and not some other person' was targeted." *Hernandez-Cartagena v. Barr*, 977 F.3d 316, 321–22 (4th Cir. 2020) (emphasis omitted) (quoting *Alvarez Lagos v. Barr*, 927 F.3d 236, 249 (4th Cir. 2019)). In *Hernandez-Cartagena*, for example, the applicant and

---

[4] The parties agree that only the BIA's decision is relevant to our analysis because the IJ did not reach the nexus issue.

her siblings received death threats after her parents failed to make extortion payments to a gang. *Id.* at 318. She sought asylum in the United States, claiming that the gang persecuted her on account of her familial ties. *Id.* at 319. The IJ denied her requested relief, focusing on the fact that "the primary motivation for targeting [Hernandez-Cartagena's] family was monetary gain." *Id.* The BIA affirmed, similarly focusing on how Hernandez-Cartagena received threats "because of [her] failure to meet the extortion demands, rather than [her] family ties." *Id.*

We reversed these nexus findings because the IJ and BIA "erred by focusing narrowly" on why Hernandez-Cartagena's family was targeted by gang members. *Id.* at 322. While her family at large was targeted for extortion threats, we explained that the agency should have focused on why Hernandez-Cartagena received those threats. *Id.* We concluded that had the agency employed the proper analysis, it would have been compelled to recognize that although Hernandez-Cartagena's "family was being targeted for extortive threats," the reason "she was targeted" with death threats was "because her parents were failing to comply" with the demanded payments and the gang wanted "to get her parents to pay up." *Id.* at 322–23 (emphases omitted); *see also, e.g.*, *Perez Vasquez*, 4 F.4th at 223 (finding legal error based on a fact pattern and agency decisions nearly identical to those in *Hernandez-Cartagena*); *Salgado-Sosa*, 882 F.3d at 458 ("[T]he BIA's decision improperly focused on whether Salgado-Sosa's *family* was persecuted on account of a protected ground, rather than on whether [*he*] was persecuted because of a protected ground—here, his relationship to his family.").

9

In Petitioner's case, the BIA did not make a similar error. The BIA properly asked why the narcotraffickers targeted Petitioner "and not some other person." *Hernandez-Cartagena*, 977 F.3d at 322 (emphasis omitted). It specifically found that Petitioner's and her daughter's familial ties to Urbina were not "a reason for the claimed harm *to* [*them*]," A.R. 4 (emphasis added), and that "the drug traffickers targeted [Urbina] *and his family* . . . because these criminals wanted to take [the] land," *id.* (emphasis added). As it happens, the BIA found that the reason that Urbina was targeted *and* the reason Petitioner *continued to be targeted* were nearly identical: the narcotraffickers believed she now owned what was originally Urbina's land and they wanted to keep it. Our precedent shows that was the correct legal standard to apply when considering Petitioner's applications. Whether the record *supported* that finding is a different question, and the one to which we now turn.

B.

The next question for our review is whether substantial evidence supports the BIA's factual finding that narcotraffickers targeted Petitioner because of their continued desire to occupy the land rather than because of her familial relationship to Urbina.

To demonstrate the requisite nexus, Petitioner needed to show only that her familial ties to Urbina were "at least one central reason" for her persecution. 8 U.S.C. § 1158(b)(1)(B)(i). As we have recognized, "more than one central reason may, and often does, motivate a persecutor's actions." *Cruz v. Sessions*, 853 F.3d 122, 128 (4th Cir. 2017); *see also Alvarez Lagos*, 927 F.3d at 250 ("The protected ground need not be the only reason—or even the dominant or primary reason—for the persecution."). That said, "[n]ot every threat that references a family member is made on account of family ties." *Toledo-*

10

*Vasquez v. Garland*, 27 F.4th 281, 288 (4th Cir. 2022) (alternation in original) (quoting *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 950 n.7 (4th Cir. 2015)). Again, "the operative question" is whether Petitioner's familial ties to Urbina were a central reason why she, "and not some other person," was persecuted. *Perez Vasquez*, 4 F.4th at 222 (cleaned up).

1.

Petitioner contends that the record compels finding that at least one central reason for her persecution was her familial relationship to Urbina. Otherwise, she argues, gang members would have had no reason to target her for death threats. According to Petitioner, "[t]he drug traffickers assumed that, based on her familial relationship, she was the pressure point to ensure there would be no future challengers to their use of the property." Suppl. Opening Br. 16. She posits that narcotraffickers would have seen her as the "pressure point" because she was both "the partner of the murdered landowner," i.e., Urbina, "and the mother of the rightful heir to that property." *Id.* at 18. She therefore asserts that the record compels the conclusion that her familial relationship to Urbina was not only one central reason but "the only reason" she was targeted for persecution. *Id.* at 16.

The Government, defending the BIA's finding, argues Petitioner's relationship with Urbina was not a central reason for her persecution because "[t]here was nothing unique about [Petitioner] based on her membership in her partner's family that made her a target, as opposed to anyone else whom the gang perceived as owning the land." Supp. Resp. Br. 17–18. It points to the evidence that other neighboring landowners, mostly unrelated to Urbina, were similarly threatened with consequences if they did not give up their land for the narcotraffickers' landing-strip project. And it points out that Petitioner admitted that

11

she fears returning to Honduras because narcotraffickers would "assume that she had returned in order to reclaim her partner's property." *Id.* at 18. The Government further posits that the single threatening call Petitioner received while living in Honduras "did not seek to leverage [her] relationship to her husband" but was "ostensibly to prevent her from asserting any legal claim to the land." *Id.* at 22–23. It therefore submits that substantial evidence supports the conclusion that the threats Petitioner received were tied "directly to the land and not to a familial or kinship relationship." *Id.* at 18. We find the Government's position persuasive.

The fundamental flaw with Petitioner's argument is that it conflates evidence that *could* support her reading of the record with evidence that *compels* her reading. While her reading of the record may be plausible, "our task is not to decide how we would rule in the first instance." *Temu v. Holder*, 740 F.3d 887, 891 (4th Cir. 2014). The BIA had to make inferences about the narcotraffickers' motivations given the sparse factual record before it. Among other possible interpretations, it inferred that the narcotraffickers believed that Petitioner was the rightful owner of the land and therefore saw her as a threat to their continued possession of it. This reading of the record was supported by substantial evidence. The "highly deferential" standard of review demanded by the INA, *Nasrallah*, 140 S. Ct. at 1692, coupled with the instructive nexus analyses in two of our recent decisions, require that we defer to the BIA's finding that Petitioner's familial ties to Urbina were not a central reason for her persecution.

The first relevant decision, which the Government discusses at length in its supplemental briefing, is *Toledo-Vasquez*. The asylum applicant, Veronica Toledo-

Vasquez, claimed that she was threatened with death on account of her familial relationship to her sister, Guisela. 27 F.4th at 284–85. The persecution Veronica suffered came at the hands of Guisela's husband, Rogelio. *Id.* at 283–84. Rogelio was abusive to Guisela, and Veronica attempted to intervene and help Guisela and her children escape the abusive relationship. *Id.* Among his many other heinous retaliatory acts, Rogelio had Veronica's husband kidnapped and murdered. *Id.* at 284. Veronica testified against Rogelio at his subsequent murder trial, and after doing so, she fled to the United States while still receiving death threats from Rogelio and his "henchmen." *Id.*

The IJ and the BIA rejected Veronica's subsequent asylum application, and we denied her petition for review. We held that substantial evidence supported the agency's finding that Veronica's familial relationship with her sister was not a central reason for her persecution. *Id.* at 287. At most, we determined, "Veronica's membership in Guisela's family was . . . incidental, tangential, superficial and subordinate" to her persecution. *Id.* An important aspect of Veronica's case was the timing of the threats she received: "every threat made by Rogelio to Veronica came after her attempts to rescue Guisela from Rogelio's abuse." *Id.* "Nothing in the record suggest[ed] that any of Guisela's family members were subjected to Rogelio's wrath until they attempted to help Guisela." *Id.* Importantly, Rogelio also persecuted both family members *and* nonfamily members alike for the same reason: attempting to help Guisela escape the abusive relationship. *Id.* at 288–89. So we reasoned that the record holistically reflected that "had Veronica been someone else, and not a family member, she would have been targeted just the same" as a result of her efforts to aid Guisela. *Id.* at 291. We therefore held that the record did not compel the

13

conclusion that Veronica's PSG—her familial relationship to her sister—was a central reason for her persecution. *Id.*

The second relevant decision is *Cedillos-Cedillos v. Barr*, 962 F.3d 817 (4th Cir. 2020). In that case, Cedillos witnessed gang members murder his brother. *Id.* at 820. A month after he reported the crime to police, the gang members began looking for Cedillos at his home. *Id.* at 820–21. The attackers also called and eventually visited the home of one of Cedillos' friends to try to speak with Cedillos, but their efforts failed. *Id.* at 821. Cedillos then fled to the United States and sought asylum, claiming that the gang members' efforts to find and contact him was "persecution" on account of the PSG constituting his nuclear family. *Id.* The IJ denied his asylum claim, concluding that even if Cedillos had been persecuted, he had not shown that it occurred on account of his familial ties to his brother. *Id.* The BIA affirmed that decision. *Id.* at 822.

We denied Cedillos' petition for review of the agency's decision on the same ground, holding that the record did not "compel the conclusion that Cedillos was targeted—in whole or in part—because the men who attacked his brother were concerned with his membership in his nuclear family." *Id.* at 826. While the gang members recognized Cedillos as the victim's brother, "it [did] not inevitably follow that the attackers' motivation was [Cedillos'] relationship to his brother." *Id.* at 825. Instead, "the events as recounted by Cedillos indicate[d] that the attackers approached him because he was the sole witness to a crime they committed, in an attempt to prevent him from, or retaliate against him for, reporting them to the police." *Id.*

14

In so holding, we carefully distinguished Cedillos' case from others in which the petitioner's familial relationship was one of several intertwined reasons for persecution. Contrary to those other cases, the record in Cedillos' case permitted the inference that "the threats made to [him] could have been directed at any person who witnessed his brother's killing." *Id.* at 826. That was because "the attackers never mentioned his brother to him; they did not go to his family's home . . .; and they [had] never contacted any other member of his family." *Id.* Moreover, Cedillos "knew the attackers' identity not because of information he learned through his familial relationship with his brother, but only because he happened upon the assault." *Id.* We could therefore discern no record evidence compelling the conclusion that Cedillos' familial ties were part of the attackers' calculus in deciding to persecute him. *Id.*

Similarly, here, substantial evidence supports the BIA's finding that the narcotraffickers' motivation for targeting Petitioner was "entirely consistent with a motivation independent of [her] family ties." *Toledo-Vasquez*, 27 F.4th at 288. Petitioner admitted as much both during her credible fear interview and her testimony before the IJ. But we need not rely just on her admissions, as the persecution that other neighboring landowners suffered at the hands of the same narcotraffickers, the lack of threats to other members of Urbina's family, and the timing of the threat Petitioner received all provide further support for the agency's finding that Petitioner's familial relationship with Urbina was "incidental" or "subordinate" to her persecution. *Id.* at 286.

Beginning with Petitioner's own admissions, she twice asserted during her credible fear interview at the border that the unnamed individual on the phone threatened her only

15

because of the potential that she would return and attempt to reassert her perceived ownership claim to the land. *See* A.R. 298 ("They said that they were going to kill me if I went back for the pieces of land, and they had killed my husband for land."); A.R. 299 ("Q. If the drug dealers were fighting [your husband] over land, why do you believe they wanted to harm you? A. [T]hey were thinking that one day I could take it away and I do not know anything . . . else."). She echoed that same sentiment during her testimony before the IJ, who pointedly asked her, "Why would narco traffickers be interested in you or any of your family members?" A.R. 97. She responded, "Because they think that I'm going to go back and take over the property that belonged to my husband." *Id.* These statements are all highly probative in our nexus analysis and support the BIA's determination that Petitioner's familial ties were subordinate to the narcotraffickers' desire to maintain possession of what was Urbina's land. *See Cedillos-Cedillos*, 962 F.3d at 825 (citing Cedillos' credible fear interview and IJ hearing testimony that he believed he was targeted "because [he] was the only witness" to his brother's murder as evidence of the gang members' "independent" motivation for targeting him for persecution).

Additionally, and just as significant, substantial evidence shows that the narcotraffickers would have persecuted any individual in Petitioner's position, regardless of whether or not he or she was a member of Urbina's family. Just as in *Toledo-Vasquez*, the record makes clear that the narcotraffickers "persecuted family members and nonfamily members alike." 27 F.4th at 289. Petitioner testified that Urbina's neighboring landowners, only one of whom was a relative, ceded their land upon the narcotraffickers' demands. *See* A.R. 103 (Petitioner explaining that "several" neighbors were "already forced . . . off their

16

land or killed," and that many, like her, had fled to the United States). Indeed, according to Petitioner, to this day "everybody's scared to do anything" on the land that was seized "[b]ecause [the narcotraffickers] sent out a form of communication saying that nobody could get . . . in there." A.R. 93–94. And on this point, too, the IJ pointedly asked Petitioner: "Is it your understanding that these drug traffickers are willing to do anything to get — to remove the people who interfere with them taking over the land?" A.R. 105. She responded, "Yes." A.R. 106. Thus, much like in *Toledo-Vasquez*, "the common denominator" as to whom the narcotraffickers persecuted "was not family relationship; it was whether the person" *owned land* upon which they wanted to build a landing strip. 27 F.4th at 289. So substantial evidence supported the BIA's inference that the threats directed at Petitioner "could have been directed at any person" who owned the land, irrespective of any familial relationship to him. *Cedillos-Cedillos*, 962 F.3d at 826. Or, as the BIA succinctly found, narcotraffickers targeted her and not another person "because [they] wanted to take [Urbina's] land," which they believed she owned. A.R. 4.

That no one else in Urbina's family has been threatened further supports the finding that Petitioner's familial relationship to Urbina was incidental or subordinate to her persecution. *See Cedillos-Cedillos*, 962 F.3d at 826 (explaining that gang members' lack of contact with Cedillos' family, coupled with the fact that the gang never threatened his other family members, supported the agency's view "that family membership was not an 'intertwined' reason for the threats against Cedillos"). As we noted previously, narcotraffickers seized land from one of Urbina's neighboring relatives, but Petitioner provided no evidence suggesting that narcotraffickers seized that land *because of his or*

17

*her familial relationship to Urbina*, much less that they targeted any of the other neighboring landowners based on their own familial ties. The BIA was therefore justified in finding that the narcotraffickers were engaged only in a "land dispute," A.R. 4, not in a dispute against members of the Urbina family, *see Niang*, 492 F.3d at 511 (demanding deference to an agency's factual finding if the record "plausibly could support" the result the agency reached).

Finally, the timing of the narcotraffickers' single threat to Petitioner reinforces the BIA's finding that the narcotraffickers were only concerned with Petitioner's status as a landowner. *See Toledo-Vasquez*, 27 F.4th at 287 ("The 'timing of threats can be relevant in determining a persecutor's motivation.'" (quoting *Alvarez Lagos*, 927 F.3d at 251)). To start, there is no evidence in the record that Petitioner was ever contacted by the narcotraffickers prior to her perceived ownership of the land after Urbina's death. And by Petitioner's account, the single phone call she received came in November 2014, nearly fifteen months after her husband was murdered and she and her daughter had vacated the property. After she complied with the unknown caller's order to "leave the city that [she] was living in," A.R. 90, *the threats ceased*. Petitioner never again saw or heard from anyone she suspected to be one of the narcotraffickers. The lack of continuing threats under these circumstances provides additional substantial evidence to support the BIA's interpretation of the narcotraffickers' motivations. *See Cedillos-Cedillos*, 962 F.3d at 826. *Compare with Cruz*, 853 F.3d at 129–30 (finding a nexus between persecution and familial ties based on evidence that the petitioner's persecutor, whom she suspected murdered her husband, made "ongoing threats . . . against [the petitioner] and her children over a period of two years"

18

because of his fear that "she would report 'him' to police" for her husband's murder, even "after she promised [her persecutor] that she would not contact the police").

In sum, the record permitted the BIA to infer that Petitioner received a single death threat after the narcotraffickers who took her husband's land learned she lived nearby and believed she might try to assert ownership over that land. That threat shared a "common denominator" with the threats previously received by all of Urbina's neighbors, regardless of their familial relation to him: they all owned land that the narcotraffickers wanted for their landing strip. *Toledo-Vasquez*, 27 F.4th at 289. It necessarily follows that "the threats made to [Petitioner] could have been directed at any person who" possessed the land after Urbina's death, *Cedillos-Cedillos*, 962 F.3d at 826, thereby permitting the BIA to find that Petitioner's familial ties were at most "subordinate" or "incidental" to her persecution, *Toledo-Vasquez*, 27 F.4th at 287. We therefore conclude that substantial evidence supports the BIA's conclusion that the narcotraffickers were only driven by their desire "to take [Urbina's] land." A.R. 4. The record does not compel the conclusion that one central reason why Petitioner, and not someone else, was targeted for a death threat was her domestic partnership with Urbina.

## 2.

Petitioner's argument to the contrary rests primarily upon the caller's statement that if she did not leave the area, she would end up like "the father of [her] daughter." A.R. 89. She contends that this statement shows that the narcotraffickers believed that she, "because of her relationship with [Urbina], was key to ensuring that they would suffer no interference with their use of the property." Supp. Opening Br. 10. Thus, she asserts that any reasonable

19

factfinder would be compelled to conclude that her familial relationship to Urbina was at least one central reason that she, and not another person, was targeted for persecution. Petitioner cites several of our nexus cases to support her argument, but her case is factually distinguishable such that we are not compelled to accept her assertion.

In each of Petitioner's cited cases, we determined that persecution occurred on account of family ties because the record unmistakably reflected that the persecutor sought to leverage the applicant's familial ties as a means to a desired end. *See Hernandez-Avalos*, 784 F.3d at 950 (holding that a mother was persecuted because of her familial relationship to her son given that gang members sought to "leverage[] [her] maternal authority to control her son's activities" in order to get the son to join the gang); *Hernandez-Cartagena*, 977 F.3d at 322–23 (holding that a daughter was persecuted because of her familial relationship to her parents; her parents failed to make extortionate payments to gang members, and we determined that the record compelled the inference that gang members targeted her "to get *her parents* to pay up"); *Arita-Deras v. Wilkinson*, 990 F.3d 350, 360–61 (4th Cir. 2021) (holding that a wife was targeted on account of her marital relationship to her husband because the gang member persecuted her in an "attempt to force [her husband] to return to Honduras"); *Funez-Munguia v. Garland*, No. 20-2124, 2021 WL 5492981, at *1–2, *4 (4th Cir. Nov. 23, 2021) (vacating the BIA's nexus finding because it failed to recognize that the applicant was targeted on account of her familial ties, given that the gang member who persecuted her targeted her based on his (mistaken) belief that the applicant could use her familial ties to an apartment building manager to have the gang member evicted).

20

The factual scenario in each of these cases is not presently before us. Had the narcotraffickers here threatened Petitioner while Urbina was alive in order to coerce him to give up his land to the narcotraffickers, the BIA might well have been compelled to reach a different result. Alternatively, had Petitioner proffered proof that the narcotraffickers knew her daughter was the lawful owner of the land and thought Petitioner was the "pressure point" for ensuring her daughter did not exercise her rights to the land, that too may have compelled the BIA to reach a different result. But by Petitioner's own admission, the record "is not entirely clear . . . whether the narco-traffickers believed Petitioner was legally entitled to have the property titled in her own name or if they viewed her as simply an individual who could influence how the property was administered." Supp. Opening Br. 9. In the face of this factual deficiency, the BIA reasonably inferred that Petitioner could not have leveraged her familial ties to have the narcotraffickers evicted from the property; she could have only used her own (nonexistent) *ownership rights* to the property to have the narcotraffickers evicted.[5] Those inferences, as we have explained, are

---

[5] Petitioner's concession that it "is not entirely clear on this record . . . whether the narco-traffickers believed [she] was legally entitled to have the property titled in her own name" after Urbina's death, Suppl. Opening Br. 9, also precludes her reliance upon *Cruz* and *Aleman-Medrano v. Garland*, No. 20-1821, 2021 WL 5054688 (4th Cir. Nov. 1, 2021). In both cases, the applicant's familial ties started a causal chain of events resulting in the applicant's persecution, so we held that any reasonable factfinder would be compelled to conclude that those ties were a central reason for the persecution. *See Cruz*, 853 F.3d at 129 ("The BIA and IJ shortsightedly focused on [the persecutor's] articulated purpose of preventing [the applicant] from contacting the police, while discounting the very relationship that prompted her to search for her husband, to confront [her persecutor], and to express her intent to contact the police."); *Aleman Medrano*, 2021 WL 5054688, at *4 ("The gang may have wished to exact 'vengeance and retribution' against Aleman-Medrano for filing a police report, but the thing that brought Aleman-Medrano to the police station and allowed the police to pressure him into filing that report was his relationship

supported by substantial evidence. We are therefore left with no basis upon which to disturb the BIA's nexus finding.[6]

## IV.

Given the dearth of record evidence as to what the narcotraffickers who persecuted Petitioner knew when they threatened her with death, the BIA had to make inferences. Among other sets of plausible inferences, the BIA inferred that the narcotraffickers surmised that Petitioner obtained ownership rights over the land that once belonged to Urbina and therefore persecuted her because she jeopardized their continued possession of that land. That inference was supported by substantial evidence and represents a motivation for persecution wholly "independent of [Petitioner's] family ties." *Cedillos-Cedillos*, 962 F.3d at 826. Under our "highly deferential" standard of review, *Nasrallah*, 140 S. Ct. at 1692, we cannot upset that determination even though reasonable minds might have made different inferences from the same set of facts, 8 U.S.C. § 1252(b)(4)(B); *see Niang*, 492 F.3d at 511.

Accordingly, the petition for review is

*DENIED.*

with his daughter." (citation omitted)). In contrast, Petitioner here presented the agency with no extrinsic evidence that would compel the conclusion that a causal chain exists between her familial ties to Urbina and her persecution.

[6] Given this holding, we need not address the other errors Petitioner claims the BIA made in denying her applications for asylum and withholding of removal. *See Cortez-Mendez v. Whitaker*, 912 F.3d 205, 209 (4th Cir. 2019) (declining to address other claimed errors in the agency's decision since the nexus issue was "dispositive").